**UNITED STATES of America, Plaintiff,**

v.

**TEN CARTONS, more or less, of an article of drug,.... * * * ENER–B NASAL GEL, etc., et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**NATURE'S BOUNTY, INC., Defendant.**

**Nos. CV 88–3000 (ADS), 90–1635 (ADS).**

United States District Court,
E.D. New York.

March 24, 1995.

Zachary W. Carter, U.S. Atty. E.D.N.Y., Brooklyn, NY (Charles S. Kleinberg, Asst. U.S. Atty., Denise Zavagno, Matthew E. Eckel, of counsel), for plaintiff.

Bass & Ullman, New York City (Milton A. Bass, Robert Ullman, Jacob Laufer, James N. Czaban, of counsel), for defendants.

## OPINION AND ORDER RE: REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE; INJUNCTIVE RELIEF AND DISGORGEMENT

SPATT, District Judge:

Before the Court are the objections of the defendant Nature's Bounty, Inc. ("Nature's Bounty" or "defendant") to the Report and Recommendation of United States Magistrate Judge Allyne R. Ross—now a United States District Judge in this district—dated September 23, 1994 ("Report"), regarding the defendant's nasally administered vitamin B–12 preparation called Ener–B Nasal Gel ("Ener–B"). This Court referred to Judge Ross the issue of whether Ener–B is a "food" or a "drug" within the meaning given to these terms by the Federal Food, Drug and Cosmetic Act ("FDCA" or the "Act"), 21 U.S.C. §§ 301–395 (1988 & Supp. V 1993) (unless otherwise indicated, all citations to the U.S.C. are to the 1988 edition and 1993 volume supplement). Judge Ross found that the Food and Drug Administration ("FDA") reasonably determined that Ener–B was a drug and not a "food" within the meaning of sections 201(f) and 201(g)(1)(C) of the Act, 21 U.S.C. §§ 321(f) and 321(g)(1)(C), and recommended that the Court defer to the agency's determination. Her well-reasoned and thorough Report merits publication and is appended at the end of this opinion.

### BACKGROUND

The defendant markets Ener–B, which is intended to be applied to the inside of one's nose. As intended to be used, the vitamin B–12 contained in Ener–B bypasses digestion through the gastrointestinal tract, where it would be absorbed into the body through the intestines. Instead, Ener–B's vitamin B–12 is absorbed directly into the blood stream through the nasal mucosa.

On February 26, 1987, the FDA notified Nature's Bounty that the FDA considered Ener–B to be a "drug" under the FDCA, and that Ener–B was being marketed illegally because it had not received recognition or approval as a "new drug" under the Act. The FDA also alleged that Ener–B was misbranded and improperly labelled under the Act. The FDA's notice informed Nature's

Bounty that the Act provided for the seizure of illegal products, and for an injunction against the distributor of such products.

Nature's Bounty responded to the FDA's letter, and on April 2, 1987 filed a Citizen Petition with the FDA pursuant to 21 C.F.R. § 10.30 (1994). In its petition Nature's Bounty essentially contended that Ener–B was a dietary supplement which was considered a "food" under the Act, and Ener–B's route of administration into the body bypassing digestion through the gastrointestinal tract did not reconstitute it as a "drug" under the Act. The petition requested (i) that the FDA establish and make public its policy regarding whether the method of ingestion of a substance otherwise classified as a food may make it a drug under the Act; (ii) promulgate a rule or guideline subject to notice and comment with respect to its policy; and (iii) refrain from taking any administrative or enforcement action against Ener–B in the absence of any policy delineated by a rule or guideline.

On May 24, 1988, the FDA denied Nature's Bounty's petition. As described in greater detail later in this Opinion, the FDA explained its denial on the grounds that it considered Ener–B to be a "drug" within the meaning of the Act because Ener–B affected the structure of the human body, and that Ener–B could not be a "food" within the meaning of the relevant statutory section because it was not ingested—namely, it was not enterally administered into the gastrointestinal tract.

Subsequent to the denial of Nature's Bounty's Citizen Petition, the United States ("Government" or "plaintiff"), on behalf of the FDA, instituted an *in rem* proceeding against Ener–B pursuant to 21 U.S.C. § 334 on September 28, 1988, and seized ten cartons of Ener–B from Nature's Bounty. Approximately eighteen months later, on May 11, 1990, the Government brought a second action against Nature's Bounty *in personam*, pursuant to 21 U.S.C. § 332(a), seeking to permanently enjoin Nature's Bounty from selling Ener–B.

In October of 1991 the Government moved for summary judgment in its favor on the complaints in both of these cases. Relying on the depositions and declarations of two FDA scientists, the Government expounded on the rationale for denying Nature's Bounty's Citizen Petition and contended that Ener–B is a drug within the scope of 21 U.S.C. § 321(g)(1)(C) because it is labelled and marketed as a product which "affects the structure or function of the body." That section defines the term "drug" as "articles (other than food) intended to affect the structure or any function of the body of man or other animals."

The Government also contended that Ener–B cannot be a "food" within the meaning of the parenthetical exception "(other than food)" found in section 321(g)(1)(C), because the phrase "other than food" is, according to the Government, construed to mean food in the conventional sense; namely, articles which are ingested through the mouth for the primary purposes of nutrition, taste or aroma, and which are absorbed into the body through the gastrointestinal tract. According to the Government, a vitamin nasal gel by which the vitamins are absorbed into the blood stream through the nasal mucosa hardly fits the conventional meaning of the term "food."

In addition, the Government contended that Ener–B is a drug within the meaning of 21 U.S.C. § 321(g)(1)(B), in-so-far as the defendant's labelling and promotional material claimed that Ener–B mitigates the effects of several medical conditions, including lack of the "intrinsic factor," a substance produced by the stomach which is required for the absorption of vitamin B–12. Section 321(g)(1)(B) defines the term "drug" as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals."

In opposing the Government's motion, the defendant submitted the declarations of seven experts, including medical doctors, attesting to the fact that Ener–B is a food, as well as the declaration of the Executive Vice–President of Nature's Bounty attesting to the company's marketing practices. Essentially, the defendant contended that Ener–B is a food because it functions as a "food for special dietary use" within the meaning of sec-

tion 411 of the FDCA, 21 U.S.C. § 350, which is the section governing the regulation of vitamins and minerals.

As written prior to its amendment in 1994, section 350 provides that, subject to certain exceptions not relevant here, the FDA may not (1) establish maximum limits on the potency of vitamins or minerals, (2) classify any vitamin or mineral as a drug solely on the basis that it exceeds a level of potency which the FDA determines is nutritionally rational or useful, or (3) limit the combination or number of any vitamin, mineral or other ingredient of food. Section 350 further provides that these proscriptions apply to "a food to which this section applies." *See* 21 U.S.C. § 350(a). At the time of the Government's summary judgment motion, the statute defined "a food to which this section applies" as follows:

> For purposes of this section, the term "food to which this section applies" means a food for humans which is a food for special dietary use—
>
> (A) which is or contains any natural or synthetic vitamin or mineral, and
>
> (B) which—
>
> (i) is intended for ingestion in tablet, capsule, or liquid form, or
>
> (ii) if not intended for ingestion in such a form, does not simulate and is not represented as conventional food and is not represented for use as a sole item of a meal or of a diet.

21 U.S.C. § 350(c)(1). The October, 1994 amendment of the statute is discussed in greater detail later in this Opinion.

According to Nature's Bounty, Ener–B met the definition of a "food to which [section 350] applies," because it is a "food for special dietary use" which contains a vitamin that is not intended for ingestion, and does not simulate or represent itself to be a conventional food or the sole item of a meal or of a diet. Moreover, Nature's Bounty contended that because Ener–B is a "food for special dietary use," Ener–B also met the statutory definition of "food" in 21 U.S.C. § 321(f). Section 321(f) provides that the term "food" means "(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article."

In addition, Nature's Bounty contended that nowhere in the FDCA is the classification of a product as a food or a drug dependent on its route of administration or place of absorption. Rather, the defendant contended that the function of Ener–B as a "food for special dietary use," and not its route of absorption into the body, is the relevant factor for determining whether or not Ener–B is a food under the meaning given to that term by the Act.

Finally, Nature's Bounty contended that it had been arbitrarily and capriciously discriminated against by the Government, because manufacturers of other vitamin B–12 tablets that allegedly also are not ingested, such as "sublinguals" absorbed under the tongue, were not subject to the Government's enforcement efforts.

On October 9, 1991 this Court issued its decision denying the plaintiff's motion for summary judgment. The Court's Memorandum Decision and Order is reported at 1991 WL 641573, 1991 U.S.Dist. LEXIS 14872 (E.D.N.Y.1991) ("Decision"). After considering the contentions of both parties, the Court found that, in view of the contradictory affidavits of the parties' experts, there were genuine material issues of fact regarding the nature of Ener–B which precluded granting summary judgment. Noting that in analogous circumstances the United States Court of Appeals for the Second Circuit had remanded cases involving the interpretation of the term "drug" under the FDCA for a hearing to be conducted that would enhance the record, the Court referred the matter of whether Ener–B was a "drug" or "food" under the Act to Judge Ross for a hearing and report and recommendation. The hearing was to include the testimony of expert witnesses, if offered.

## FINDINGS AND CONCLUSIONS BY JUDGE ROSS

Judge Ross conducted a five-day evidentiary hearing, which took place on June 16–18, 1993, and July 6 and 7, 1993. Seven expert witnesses were called, three by the Government and four by the defendant.

Judge Ross found that the credible expert testimony offered at the hearing, by both the Government's and the defendant's experts, strongly supported the conclusion that the common sense and scientific definitions of "food" entail two elements: (i) nutrient intake, and (ii) ingestion into the gastrointestinal tract of such nutrients, also known as enteral administration of nutrients. According to Judge Ross, ingestion into the gastrointestinal tract was viewed as a necessary element of a food by the medical and scientific communities:

> [The] common sense and scientific definitions of "food ... for man" that incorporate as a necessary element ingestion into the gastrointestinal tract are both reasonable and accepted by a substantial segment of the medical and scientific community. As evidenced by certain defense expert definitions, other respectable segments of the scientific community apparently adopt a more expansive definition that includes parenterally administered nutrients as well. This showing, however, does not impeach the evidence that a definition requiring enteral administration is reasonable and is also well accepted by credible scientists.

Report at 9–10.

Indeed, to highlight the point Judge Ross cited to the testimony of the defendant's expert Dr. Raymond R. Brown, retired Professor Emeritus at the University of Wisconsin Medical School, who acknowledged in his testimony that "whether Ener–B is drug is a question as to which reasonable scientists could reasonably disagree." Report at 12, 27 (citing Tr. at 545).

Judge Ross also found that the Government adduced substantial evidence through learned treatises and expert testimony regarding the different physiologies of the digestive and respiratory systems, including the mechanisms present in the gastrointestinal tract for the transport, storage and absorption of nutrients. This evidence was not disputed by the defendant's experts.

According to Judge Ross, the experts also agreed "virtually unanimously" that the mucosa lining the nasal cavity are functionally dissimilar to the membranes lining the gastrointestinal tract. As a result of this difference, Judge Ross found that both parties' experts acknowledged (1) "that parenteral administration bypasses the normal physiological safety mechanisms present in the gastrointestinal tract," and (2) that the route of exposure to the nutrients, namely whether absorption occurs through the nasal mucosa or through ingestion, has an impact on toxicity. Report at 11–12.

Based on these findings, Judge Ross concluded that the agency's determination that Ener–B is not a food based on its route of administration into the body is reasonable, and in accord with the Second Circuit's interpretation of the term "food" in the parenthetical exception to section 321(g)(1)(C); namely, that Congress intended the term to have "the everyday meaning of food." Report at 25 (citing *American Health Products v. Hayes*, 574 F.Supp. 1498, 1504 (S.D.N.Y. 1983) (construing the term "food" in the parenthetical exception to section 321(g)(1)(C) as having been intended by Congress to refer to its "common usage"), *aff'd*, 744 F.2d 912 (2d Cir.1984)).

Moreover, Judge Ross concluded that the agency's determination regarding Ener–B is consistent with the FDA's prior actions categorizing parenterally administered nutrients as non-foods under the Act. Judge Ross supported this conclusion by pointing to (i) the October, 1981 FDA Vitamin/Mineral Task Force's Conclusions and Recommendations regarding the regulation of orally ingested vitamin preparations, which recommended that all ingested vitamin/mineral products be regulated as foods, while injectable or topical vitamin/mineral preparations be regulated as drugs, (ii) the agency's regulation of injectable vitamins as drugs, *see* 49 Fed.Reg. 36446, 36448 (1984), (iii) the FDA's Aminoplex Notice, *see* 52 Fed.Reg. 25072–75 (1987), which stated that amino acids, vitamins and other nutrients intended as injections "have been regarded as drugs by the medical profession, by FDA, and by the regulated industry for more than 40 years," and (iv) the FDA's May 24, 1984 response to the defendant's Citizen Petition, which stated that "[t]he Agency has consistently regulated vitamin and mineral parenteral and topically-

administered nutritive products as drugs," and "[t]he standard the Agency applies for classification of vitamin, mineral or other dietary products is the route of administration." According to Judge Ross: "no evidence disputes that route of administration has been a criterion consistently invoked by the agency in determining whether the Act requires regulation of a product as a food or a drug." Report at 25.

With regard to the defendant's contention that Ener–B was a "food for special dietary use" under the Vitamins and Minerals section of the FDA, Judge Ross concluded that the contention was untenable because that section applies to "food for humans which is a food for special dietary use." *See* 21 U.S.C. § 350(c)(1). Interpreting the statute as requiring that the vitamin or mineral must first be a "food for humans" within the meaning of section 321(f)(1) before it can be subject to section 350(c)'s provisions as a "food for special dietary use," Judge Ross determined that Ener–B was unqualified as a food for special dietary use, because it was not a "food" within the meaning of section 321(f)(1). Report at 29–30.

In addition, Judge Ross concluded that the defendant's construction of section 350(c)(1)(B)(ii) was erroneous. As mentioned earlier, section 350(c)(1)(B) provides that a food for special dietary use must "(i) [be] intended for ingestion in tablet, capsule, or liquid form, or (ii) if not intended for ingestion in such a form, does not simulate and is not represented as conventional food ... [or] for use as a sole item of a meal or of a diet." Nature's Bounty contended that Ener–B is a "food for special dietary use" because under section 350(c)(1)(B)(ii) it is "not intended for ingestion."

Judge Ross determined that the defendant's construction did not accord with the language of section 350(c)(1)(B)(ii), because the defendant selectively interpreted the statute by neglecting the words "in such form" at the end of the phrase "is not intended for ingestion in such form." According to Judge Ross, the words "in such form" are properly interpreted as referring to the forms of ingestion specified in the previous section of the statute, 350(c)(1)(B)(i), namely "tablet, capsule or liquid form." Thus, Judge Ross interpreted the language of section 350(c)(1)(B)(ii) as supporting the FDA's contention that Ener–B was not a "food," since the forms of ingestion specified in the statute involve enteral administration of the vitamin by swallowing. In further support of this construction of section 350(c)(1)(B)(ii), Judge Ross cited to the legislative history of the section, which expressly stated that section 350 prohibited the FDA from regulating oral preparations of vitamins or minerals. Report at 31.

Finally, Judge Ross determined that there was no merit to Nature's Bounty's discrimination claim based on the allegations that the FDA has failed to regulate sublingual tablets as drugs, and has failed to undertake enforcement actions against manufacturer's of sublingual vitamins. According to Judge Ross:

> There is no evidence in the record suggesting that the FDA has affirmatively adopted [an] inconsistent approach to the regulation of sublinguals and Ener–B. Indeed, while it is true that no enforcement action has as yet been taken against sublinguals, the FDA has never taken the position that sublingual tablets are foods.

Report at 33.

Based on her findings and conclusions, Judge Ross recommended that this Court (1) defer to the agency's determination that Ener–B is an unapproved "new drug" pursuant to 21 U.S.C. § 321(p), (2) that as such, Ener–B is subject to condemnation under 21 U.S.C. § 334, and (3) that Nature's Bounty be permanently enjoined from selling Ener–B, pursuant to 21 U.S.C. § 332. Report at 34.

## NATURE'S BOUNTY'S OBJECTIONS

In response to Judge Ross's Report, Nature's Bounty filed its Objections to the Report and Recommendation of Judge Ross ("Objections") contending that Judge Ross erred both legally and factually. Oral argument was heard on the Objections on March 10, 1995.

Nature's Bounty first objects that Judge Ross did not follow this Court's directions, but "merely abstracted" from the record

those portions of the testimony which supported the plaintiff's claims. Moreover, Nature's Bounty contends that Judge Ross failed to report to the Court the "extensive expert testimony" that supported classifying Ener–B as a food.

The defendant further objects that Judge Ross directly contravened this Court's October 9, 1991 Decision, by holding that the defendant's intent to sell Ener–B as a food for special dietary use is irrelevant in determining the classification of Ener–B as a food or drug.

In addition to the above, Nature's Bounty also makes the following objections:

1. The Report and Recommendation is based on Judge Ross's fragmented reading of the statutory definition of food under section 321(f), resulting in erroneous legal and factual determinations;

2. The FDA's determination that the statutory definition of "food" must be defined by its common sense use is contrary to the language of the statute, irrational and arbitrary, and deference to the Agency in this case is not warranted;

3. Judge Ross's construction of the statutory definition of "food" would alter the meaning of the term "food" such that food supplements in unusual forms, such as tablets or capsules, would no longer meet the definition of food under the Act. This result would be contrary to congressional intent, and directly at odds with the FDA's regulation of other unusual methods of administration, such as tubes and sublinguals, as foods;

4. Judge Ross ignored testimony and evidence which conclusively demonstrated that Ener–B is intended to deliver vitamin B–12 for nutritive value, and that the vitamin B–12 supplied by Ener–B functions in every way the same as vitamin B–12 obtained from any other food source;

5. Judge Ross improperly based her recommendation on alleged safety concerns;

6. The Government altered its litigation position since this Court's denial of its summary judgment motion, and Judge Ross based her conclusions on "pure *post*

*hoc* rationalizations invented" by the Government;

7. The prior agency actions relied upon by Judge Ross as indicative of a consistent FDA policy to not regulate products parenterally administering nutrients as foods are irrelevant, because the agency's actions in these cases were not based on route of administration of the product;

8. Judge Ross erred in determining that the Government did not discriminate against Nature's Bounty, and the fact that FDA has not taken any enforcement action against sublinguals supports the defendant's contention that the FDA treats sublinguals as food.

9. Judge Ross erred in three evidentiary rulings. These rulings concerned a motion by Nature's Bounty to supplement the record, and two requests by the defendant to, respectively, call all of its experts to testify and introduce a report into evidence.

After Nature's Bounty filed its Objections, Congress enacted the Dietary Supplement Health and Education Act of 1994, Pub.L. No. 103–417, 1994 U.S.C.C.A.N. (108 Stat.) 4325 (codified at various sections of 21 U.S.C. § 301–395 and 42 U.S.C. §§ 281(b)(2) and 287c–3) (enacted on October 25, 1994, hereinafter "DSHEA"). The DSHEA, among other things, amends the FDCA by providing that subject to certain exceptions, products defined as "dietary supplements," which include vitamins, minerals, amino acids and herbs, are a "food" and are not to be classified as a "drug" under section 321(g)(1) solely because of any statements on the products' labelling regarding claims to alleviating a nutritional deficiency or disease. *See* DSHEA §§ 3, 10 (defining a "dietary supplement" and amending 21 U.S.C. § 321(g)(1); respectively codified at 21 U.S.C.A. §§ 321(ff) and 321(g)(1) (West Supp.1994)). Significantly, the DSHEA also amends section 350(c)(1)(B) by adding the words "powder, softgel, and gelcap" after "capsule" in section 350(c)(1)(B)(i). *See* DSHEA § 3(c) (codified at 21 U.S.C.A. § 350(c)(1)(B)(i) (West Supp.1994)).

Nature's Bounty contends that the DSHEA substantially affects the posture of this case, because the DSHEA has estab-

lished a new class of products called "dietary supplements" which are defined as foods and are allegedly excluded from regulation as a drug under section 321(g)(1)(C). According to the defendant, all of the testimony and evidence presented by the Government before Judge Ross to support its contention that Ener–B is not a food is "now moot." Indeed, the defendant contends that the debate over the "food" exemption under section 321(g)(1)(C) is "totally irrelevant" in light of the DSHEA, and that the Court should disregard Judge Ross's Report as well as the parties' objections and response papers. Instead, Nature's Bounty claims that the Court should focus on whether Ener–B is exempt from regulation as a "drug," because it is a "dietary supplement" under the DSHEA that is subject to an entirely new statutory-regulatory framework.

The Court will consider the defendant's objections to Judge Ross's Report, and its contentions regarding the affect of the DSHEA on this case, after reviewing the applicable standard governing review of this matter.

## DISCUSSION

*Applicable Standard of Review*

■ According to the statutory provisions governing the powers of a United States Magistrate Judge, a district judge may designate a magistrate judge to hear and determine any pre-trial matter pending before the court, except certain dispositive matters that include a motion for summary judgment. *See* 28 U.S.C. § 636(b)(1)(A). In cases involving these latter-kind matters that are excepted from a hearing and determination by the magistrate judge, the district court may designate the magistrate judge to conduct an evidentiary hearing on the matter, and to submit proposed findings of fact and recommendations to the district court. 28 U.S.C. § 636(b)(1)(B). The statute requires that with respect to such proposed findings and recommendations, the district court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made," and that the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by

the magistrate." *See* 28 U.S.C. § 636(b)(1)(C).

In order to make a sufficient *de novo* determination under the statute, the district court must conduct an independent review of all objections and responses to the magistrate's findings and recommendations. *See, e.g., United States v. Tortora,* 30 F.3d 334, 337 (2d Cir.1994); *Bristol–Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1045 (2d Cir.1992). By using the phrase *de novo* determination, however, rather than *de novo* hearing, Congress intended " 'to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.' " *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989) (quoting *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980)). Thus, the statute does not require the district court to rehear the contested testimony in order to make its determination. *Grassia,* 892 F.2d at 19 (citing *Raddatz,* 447 U.S. at 674, 100 S.Ct. at 2411).

### 1. Construction of the Statutory Provision at Issue.

■ The relevant statutory provision at issue is the meaning of the term "food" set forth in the parenthetical exception "(other than food)" in section 321(g)(1)(C). That meaning, in turn, is provided by the definition of "food" in section 321(f)(1), which states "food" is: "articles used for food or drink for man or other animals." According to Nature's Bounty, rather than considering whether Ener–B comes within the ambit of the entire relevant definition of "food," namely whether Ener–B is an "article[ ] used for food ... for man," Judge Ross erroneously formulated the issue to be determined by focusing her inquiry on the latter part of the definition at issue, that is, whether Ener–B is "food ... for man." As a result, Nature's Bounty objects to Judge Ross's Report because it is allegedly premised on neglecting "key elements" of the statutory definition of food, specifically the phrase "used for food."

The Court disagrees with the defendant's objection for two reasons. First, in the Court's view, whether one concentrates on

the phrase "used for food ... for man" or on the phrase "food ... for man," the object of the statutory construction is the same; namely, determining what is denoted by the word "food." In this regard, the meaning of the term "food" in the parenthetical exclusion of section 321(g)(1)(C) and in section 321(f)(1) has been construed to refer to that term's "everyday meaning," and a particular article's "common usage" as food. *See American Health Products Co., Inc. v. Hayes*, 574 F.Supp. 1498, 1504–05, 1508 (S.D.N.Y.1983) ("The ordinary way in which an article is used ... should determine whether it is a food for the purpose of the parenthetical exclusion of section 321(g)(1)(C)."), *aff'd*, 744 F.2d 912 (2d Cir.1984), and *Nutrilab, Inc. v. Schweiker*, 713 F.2d 335, 337–338 (7th Cir. 1983) (the term "food" in section 321(f)(1) is to be defined in terms of its function, and means "articles used by people in the ordinary way most people use food—primarily for taste, aroma or nutritive value."). Moreover, the common-use meaning given to the term "food" in the parenthetical exclusion of section 321(g)(1)(C) and in section 321(f)(1) is more circumscribed and not identical to the statutory meaning of "food" under section 321(f). *See Am. Health Prods.*, 574 F.Supp. at 1504 ("[T]he meaning of the term "food" for purposes of the parenthetical exclusion and its technical statutory meaning for purposes of the coverage of the food provisions cannot be identical.").

Judge Ross appropriately relied on this interpretation of the phrase "used for food ... for man" to reach her own conclusions and recommendations. *See* Report at 25–26. Thus, the Court believes that Judge Ross did not completely neglect to consider the phrase "used for food," and did not commit any error in arriving at her recommendation based upon a definition of "food" by reference to the everyday meaning of the word.

■ Second, and more significant, the Court believes that Judge Ross properly concentrated on construing the term "food" by focusing on its context in the phrase "food ... for man" rather than "use for food." The pivotal and novel issue presented in this case is not so much whether Ener–B is a food, as it is whether the FDA may consider the route of administration of a product in determining its classification as a food or a drug under the Act. Given that the definition of a food in section 321(f)(1) already entails consideration of the functional, everyday-use aspect of food, *see Am. Health Prods.*, 574 F.Supp. at 1505, emphasis on the human—"for man"—aspect of the "use of food" seems appropriate and rational when determining whether the route of administration can be a factor in classification. Indeed, with regard to humans it is the Court's view that the route of administration cannot be ignored when considering the everyday, common use aspect of a particular article as food.

The Court further believes that by contending Ener–B is a "food" because it is "used for food," the defendant has lost sight of the real issue in this case. Nature's Bounty's syllogism is as follows: the phrase in the statute "used for food" means using a product to introduce nutritive substances into the body; vitamin B–12 is an essential nutrient for humans and is used for food; Ener–B provides vitamin B–12 for the body; Ener–B, therefore, meets the statutory definition of food because it is "an article used for food" for man. The problem with this reasoning is that it presumes to answer the very question at issue by substituting the "article" Ener–B for the "food" vitamin B–12. As explained above, the phrase "used for food for man" in section 321(f)(1) is interpreted by the everyday meaning and common usage of the term food. Although vitamin B–12 may commonly be used as a food, gels containing vitamin B–12 that are administered through the nose hardly meet the every day definition of food and are not commonly used as food, anymore than an enema containing vitamin B–12 meets the everyday definition of food.

■ The defendant also misconstrues the pertinent case law and this Court's October 9, 1991 Decision by contending that the key in determining whether a product is a food or a drug is the vendor's intent. The vendor's intent is a key element only with respect to the statutory definition of a drug under sections 321(g)(1)(B) and 321(g)(1)(C). *See Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 333 (2d Cir.1977) (the vendors' intent in selling the product to the public is

the key element in the definition of a "drug" under section 321(g)(1)(B)). That is not the case, however, with regard to determining whether a product is a food. As the court in *American Health Products* stated:

> The ordinary way in which an article is used, therefore, not any marketing claim on the part of the manufacturer or distributer as to specific physiological purpose of that use, should determine whether it is a food for the purpose of the parenthetical exclusion of section 321(g)(1)(C).

*Am. Health Prod.*, 574 F.Supp. at 1505. *Accord Nutrilab*, 713 F.2d at 337 ("Defining food as articles intended by the manufacturer to be used as food is problematic," and noting that the definition of food in section 321(f) omits any reference to intent.).

This Court's statement in its October 9, 1991 Decision that "where the substance in question is not recognized in official pharmacopoeia, 'the vendor's intent in selling the product to the public is the key element in this statutory definition,' " 1991 WL 641573, at *9, 1991 U.S.Dist. Lexis 14872 at *23 (quoting *Mathews*, 557 F.2d at 333), is not to the contrary. In its Decision, the Court was referring to a vendor's intent with regard to the definition of a drug, not of a food. Moreover, the Court notes that although the vendor may not intend to sell an item as a drug, the product may still be regulated as such. *See, e.g., Mathews*, 557 F.2d at 334 (the FDA is not bound by the manufacturer's subjective claims of intent, and can classify an article as a drug based on objective evidence of therapeutic intent).

Accordingly, Judge Ross properly formulated the statutory issue to be construed, and did not err or contravene this Court's September 29, 1991 Decision by discounting the defendant's proclaimed intent that Ener–B is a food because it is to be used for its nutritional value.

### 2. Ener–B is Neither a Food to Which Section 350 Applies, nor a Dietary Supplement under the DSHEA.

In 1976, Congress amended the FDCA by enacting section 411 of the Act, 21 U.S.C. § 350, governing the regulation of vitamins and minerals. *See* Pub.L. 94–278, § 501(a), 90 Stat. 410 (1976), commonly known as the Proxmire Amendments. The underlying purpose of this amendment involves the promotion of concentrated vitamins to help supplement peoples' diets. Basically, section 350 precludes the FDA from regulating a vitamin or mineral solely on the basis of its potency or combination with another vitamin or mineral. The provisions of section 350 apply to certain vitamins or minerals which meet the definition in section 350(c) of a "food to which [section 350] applies." Up until the enactment of the DSHEA, Nature's Bounty contended that Ener–B met the criteria set forth in section 350(c) of a "food to which [section 350] applies."

In order to further facilitate the use of vitamins and minerals to combat nutritional deficiencies and disease, portions of the FDCA, including section 350, were amended by the DSHEA in October, 1994. The basic purpose of the DSHEA amendments to the FDCA is to ensure that the public has over-the-counter access to "dietary supplements," which include vitamins, minerals, amino acids and herbs. In order to accomplish this, the DSHEA precludes the FDA from regulating "dietary supplements" as a "drug" under section 321(g)(1)(C) solely because of any statements on the products' labelling regarding claims that the product can treat or affect a nutritional deficiency or disease, unless the FDA determines that the product is not safe.

Following the enactment of the DSHEA amendments to sections 321(g) and 350, Nature's Bounty now contends that Ener–B is a "dietary supplement" as that term is defined in the DSHEA, and as such is excluded from regulation as a drug under the FDCA. The Court disagrees with both of Nature's Bounty's contentions, and believes that Ener–B is neither a food to which section 350 applies, nor a dietary supplement under the DSHEA.

### A. *Ener–B is Not a Food to which Section 350 Applies.*

■ In order to be excluded from regulation as a "drug" under the provisions of sections 350(a) and (b)—in other words, in order to be a "food to which this [section 350] applies"—, a product must, under the defini-

tion of that phrase in section 350(c) prior to the DSHEA amendments, be a "food for humans which is a food for special dietary use" which (A) is a vitamin or mineral, and (B) "which is (i) intended for ingestion in tablet, capsule, or liquid form, or (ii) if not intended for ingestion in such a form, does not simulate and is not represented as conventional food ... [or] for use as a sole item of a meal or of a diet."

As explained earlier, Nature's Bounty contends that Ener–B meets the definition of a "food to which [section 350] applies," because Ener–B is a food for special dietary use which is a vitamin, and which, according to the defendant, is "not intended for ingestion" within the meaning of section 350(c)(1)(B)(ii).

While the defendant is correct to assert that Ener–B may be used for a "special dietary use" as that term is defined in section 350(c)(3)(B), namely "to supply a vitamin for use by man to supplement his [or her] diet," the defendant's contention that Ener–B is subject to the protection of section 350 ultimately fails, because the remaining requirements that are necessary for Ener–B to be a "food" to which section 350 applies are not met. Specifically, under section 350(c)(1)(B) Ener–B must be "intended for ingestion" either in a tablet, capsule or liquid form, or if not in that form, than it must be "intended for ingestion" in some other form. Ener–B however, is not intended for "ingestion" as that term is meant to be used in the statute. The defendant's construction of section 350(c)(1)(B)(ii) to apply to foods for special dietary use that are "not intended for ingestion" is erroneous, because it reads out of the statute the words "in such form."

■ The basic canon of statutory construction is that interpretation of the statute must "begin with the language of the statute itself." *Pennsylvania Public Welfare Dept. v. Davenport*, 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). The usual "assumption [is] that the legislative purpose is expressed by the ordinary meaning of the words used," *Securities Industry Ass'n. v. Bd. of Governors*, 468 U.S. 137, 149, 104 S.Ct. 2979, 2986, 82 L.Ed.2d 107 (1984), and "the plain meaning of the statute's language should control except in the 'rare cases

[in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters.'" *Samuels, Kramer & Co. v. Commissioner of Internal Revenue*, 930 F.2d 975, 979 (2d Cir.) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)), *cert. denied*, 502 U.S. 957, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991).

■ If the statute is clear and unambiguous that is the end of the matter, for the court must give effect to the unambiguously expressed intent of Congress. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (citations, quotations and internal quotations omitted). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Id.* at 291, 108 S.Ct. at 1818.

■ The ordinary and plain meaning of the term "ingestion" means to take into the stomach and gastrointestinal tract by means of enteral administration. *See* Stedman's Medical Dictionary (4th Lawyer's Ed.1976) (defining ingestion as "the introduction of food and drink into the stomach."); Webster's Third New International Dictionary (1976) (defining ingestion as "the taking of material (as food) into the digestive system."). Two of Nature's Bounty's expert witness agreed with this definition. *See* testimony of Richard S. Litman, M.D., Tr. at 678 (agreeing that ingestion means to take into the gastrointestinal tract for absorption in the digestive system), and testimony of Dr. Edward James Calabrese, Tr. at 859–60 (agreeing that the standard meaning of ingestion is to take food into the gastrointestinal tract for processing and absorption).

The interpretation of the term "ingestion" to mean enteral administration into the stomach and gastrointestinal tract is also supported by the language of the statutory sections immediately preceding and following section 350(c)(1)(B)(ii). Section 350(c)(1)(B)(i) states that the vitamin must be intended for ingestion in tablet, capsule or liquid form. Each of these forms denotes a method of ingestion that involves swallowing

into the stomach. Section 350(c)(2) states that a food is intended for ingestion in liquid form under section 350(c)(1)(B)(i) "only if it is formulated in a fluid carrier and is intended for ingestion in daily quantities measured in drops or similar small units of measure." This elaboration of "liquid form" also denotes ingestion by swallowing the fluid.

The legislative history of section 350 further supports this interpretation of "ingestion." As Judge Ross correctly pointed out, the Senate Report accompanying the final version of the bill that was adopted by the Conference Committee with only two technical amendments, states that section 350 "prohibits the FDA from regulating the composition of *oral* preparations of vitamins and minerals." S.Rep. No. 509, 94th Cong., 1st Sess. (1975) (emphasis supplied).

Finally, interpretation of "ingestion" in section 350(c)(1)(B) to mean enteral administration into the stomach and gastrointestinal tract is not antithetical to the purposes underlying section 350, which primarily concern precluding the FDA from regulating vitamins and minerals based solely on their level of potency or combination.

Accordingly, the Court agrees with Judge Ross's construction of the phrase "intended for ingestion" in section 350(c)(1)(B), and her determination that Ener–B is not a food to which section 350 applies.

### B. *Ener–B is Not a Dietary Supplement.*

The DSHEA defines a "dietary supplement" in relevant part, as follows:

The term "dietary supplement"—

(1) means a product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients:

(A) a vitamin

. . . .

(2) means a product that—

(A)(i) is intended for ingestion in a form described in section 411(c)(1)(B)(i); or (ii) complies with section 411(c)(1)(B)(ii);

(B) is not represented for use as a conventional food or as a sole item of a meal or the diet.

. . . .

Except for purposes of section 201(g) [21 U.S.C. § 321(g)], a dietary supplement shall be deemed to be a food within the meaning of this Act.

DSHEA § 3(a) (codified at 21 U.S.C.A. § 321(ff) (West Supp.1994)).

Further, section 3(a) of the DSHEA amends section 350(c)(1)(B) by enumerating several additional forms of ingestion applicable to the definition of a food to which section 350 applies. The amendment reads:

FORM OF INGESTION.—Section 411(c)(1)(B) [21 U.S.C. § 350(c)(1)(B)] is amended—

(1) in clause (i), by inserting "powder, softgel, gelcap," after "capsule,"; and

(2) in clause (ii), by striking "does not simulate and".

As amended, the language of section 350(c)(1) that is relevant to this case now reads:

[T]he term "food to which this section applies" means a food for humans which is a food for special dietary use—

(A) which is [a] vitamin . . ., and

(B) which—

(i) is intended for ingestion in tablet, capsule, powder, softgel, gelcap, or liquid form, or

(ii) if not intended for ingestion in such a form, is not represented as conventional food and is not represented for use as a sole item of a meal or of a diet.

21 U.S.C.A. § 350(c)(1) (West Supp.1994).

■ Thus, the definition of a "dietary supplement" in the DSHEA incorporates part of the definition of a "food" to which section 350 applies: namely, the part which provides that the vitamin must be a product that is (i) "intended for ingestion in tablet, capsule, powder, softgel, gelcap, or liquid form," or (ii) "if not intended for ingestion in such a form, is not represented as a conventional food and is not represented for use as a sole item of a meal or of a diet."

Accordingly, Ener–B cannot be a dietary supplement because, as shown earlier, Ener–B is not "intended for ingestion" and, therefore, does not meet the criteria of section 350(c)(1)(B)(i) or (ii). Nature's Bounty's contention that Ener–B is perforce excluded from regulation as a drug under section 321(g)(1)(C), because it is a dietary supplement that the DSHEA defines as a food not subject to regulation under section 321(g)(1)(C), is a tautology. In order to be outside the reach of section 321(g)(1)(C), Ener–B must first meet the definition of a "dietary supplement." It does not meet the definition, and unless Ener–B falls within the parenthetical exception in the statute—which it does not—the FDA can regulate Ener–B as a drug under section 321(g)(1)(C).

 Indeed, contrary to Nature's Bounty's claims, the amendments to section 350(c)(1)(B)(ii) support the interpretation of "intended for ingestion" as referring to enteral administration into the gastrointestinal tract. The DSHEA amended section 350(c)(1)(B)(ii) by adding several more forms by which the product can be ingested: powder, softgel, and gelcap. According to the *ejusdem generis* maxim of statutory construction, which states that items following an enumeration of particular things are to be construed as applying to the same class as those things enumerated, *see e.g., Breininger v. Sheet Metal Workers Int'l Assoc.*, 493 U.S. 67, 92–93, 110 S.Ct. 424, 439, 107 L.Ed.2d 388 (1989), the addition of powder, softgel, and gelcap to the forms of tablet, capsule or liquid does not indicate any intent by Congress to change the scope of "foods to which

section 350 applies" by including products that are to be administered into the body parenterally. If anything, the opposite intent can be inferred, because all the items listed, tablet, capsule, powder, softgel, gelcap, and liquid form, involve a form of the product that must be enterally administered into the stomach through swallowing.[1]

Accordingly, it is the Court's view that Ener–B is not a dietary supplement within the meaning given to that term under the DSHEA. Moreover, the Court believes that the DSHEA amendments to section 350(c)(1)(B) do not alter, but rather support, the conclusion that Ener–B is not a "food to which [section 350] applies."

### 3. The FDA's Determination that Ener–B is Not a Food is Reasonable.

Nature's Bounty contends that the FDA's determination that Ener–B is not a food is irrational and contrary to the holdings in *Nutrilab* and *Am. Health Prods.* Essentially, Nature's Bounty contends that (1) the ingestibility of an article was explicitly excluded by the *Nutrilab* court as a factor by which to determine whether a particular article is food, (2) the fact that Ener–B is not consistent with the traditional notion of a "food" does not preclude its being regulated as a food, and (3) the FDA's determination that Ener–B is not a food in irrational and arbitrary.

### A. *Ingestibility as a Factor.*

In the Court's opinion, Nature's Bounty misinterprets the holding of *Nutrilab* with

---

1. This interpretation of "intended for ingestion" in section 350(c)(1)(B) as referring to enteral administration is further supported by the Senate Report accompanying the Senate bill that was adopted by the House and Senate as the DSHEA, with only minor amendments. In the section-by-section analysis of the bill, the Report mentions the method of delivery of dietary supplements with respect to the amendments to section 350(c)(1)(B):

 [Section 350(c)(1)(B)(i) ] is amended by adding "powder, softgel, gel cap," after the word capsule so as to include some of the methods of delivery of dietary supplements that are presently in use but which are not specifically described under current law.

 S.Rep. No. 410, 103d Cong., 2nd Sess. 34 (October 8, 1994). If Congress wished to make such a

drastic change in the law by allowing vitamins administered through the nose to be regulated as dietary supplements that are intended for ingestion, one would expect the change to have been expressly stated in the delineation of the other methods of delivery added to section 350(c)(1)(B)(i).

However, because Congress expressly precluded this Senate Report and any other report or statement other than the Statement of Agreement released jointly by the House and Senate when the DHSEA was enacted from being considered as legislative history of the DSHEA, *see* Statement of Agreement, 140 Cong.Rec. S 14801 (October 7, 1994), the report cannot be relied upon, and this Court does not rely upon it, as indicative of any congressional intent.

regard to ingestibility. In *Nutrilab,* the Court considered a challenge to the FDA's classification of starchblockers as a drug. The starchblockers at issue in that case were in tablet and capsule form and used to control weight by blocking the digestion of starch. *Id.,* 713 F.2d at 335–36. The district court construed section 321(f)(1) to mean that articles were used for food if they were solely used for taste, aroma or nutritive value. *Id.* at 338. The Seventh Circuit disagreed, and held that the district court's interpretation was unduly restrictive, since foods like prune juice and coffee could be used for reasons other than taste, aroma and nutritive value. Instead, the Seventh Circuit held that the common-sense definition of a food under section 321(f)(1) encompassed "articles used by people in the ordinary way most people use food—*primarily* for taste, aroma, or nutritive value." *Id.* (emphasis supplied). (To these uses the Court would also add aphrodisiacal purposes).

■ In arriving at its decision, the Seventh Circuit rejected the industry's argument that starchblockers were food because they were derived from a food, namely kidney beans. The Seventh Circuit held that the congressional intent underlying the definition of food in section 321(f)(1) indicates that " 'food' is to be defined in terms of its function as food, rather than in terms of its source, biochemical composition or ingestibility." *Id.* at 337. As an example, the court stated that although caffeine and penicillin are derived from foods, they are not foods. The *Nutrilab* court was, thus, emphasizing that neither an article's source nor its ingestibility can be the sole criterion for classifying it as a food.

However, stating that the ingestibility of an article cannot be the sole basis for classifying it as a food does not mean that an article's administration through a route other than ingestion cannot be a basis for determining that it is a non-food. The two propositions are exclusive. Moreover, this Court does not read the Seventh Circuit's holding as excluding consideration of ingestibility as a *functional factor* when determining whether a particular article is a food. In the Court's view, ingestion has everything to do with the common place and everyday meaning of "food," and it is completely rational to use non-ingestion as a factor for determining that something is not as food. The mistake Nature's Bounty makes here is in contending that (1) the *Nutrilab* court's preclusion of ingestibility as a basis for determining whether an article is a food also precludes the converse, namely that non-ingestibility can be the basis for determining that an article is not a food, and (2) ingestion has nothing to do with the functional aspects of the everyday meaning of a food.

For these reasons—and especially in light of the very clear holding in *Am. Health Prods.* that the term "food" in the parenthetical exception of section 321(g)(1)(C) refers to the term's common usage—Nature's Bounty's contention that the FDA and Judge Ross erred in determining that Ener–B is not a food because it does not meet the traditional notion of a "food," is untenable.

■ Equally unconvincing is the defendant's contention that nasal administration of a vitamin is no more unusual than administration by capsules and tablets once was. Assuming that one day in the future administration of vitamins through the nose will be as common as the taking of vitamin capsules and tablets now is, the decision to expedite the process is not for the Court to make in the first instance by declaring that Ener–B is a "food." Rather, in this very nebulous area of the law where an article can be both a food and a drug, *see Mathews,* 557 F.2d at 335, the Court believes that the decision is for the FDA to make in the first instance, as it is the agency containing specialized knowledge that is charged with administering the statutory provisions of the FDCA. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844–45 & n. 14, 104 S.Ct. 2778, 2782–83 & n. 14, 81 L.Ed.2d 694 (1984) (considerable weight should be accorded to an executive department's construction of a statutory scheme when more than ordinary knowledge respecting the matters subjected to its regulation is required to understand a given situation); *Friends of Shawangunks, Inc. v. Clark,* 754 F.2d 446, 449 (2d Cir.1985) (considerable deference is afforded to any reasonable interpretation of a statute

by the agency charged with administering it, "especially where specialized agency understanding is involved."); *Nat'l Nutritional Ass'n v. Weinberger,* 512 F.2d 688, 701–02 (2d Cir.) (protection of the public health dictates that the FDA's interpretation of section 321(g) "be given considerable weight."), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975).

### B. *The FDA's Determination is Not Irrational.*

■ The statutory language in sections 321(g)(1)(C) and 321(f)(1) regarding what is meant by the term "food" is ambiguous. Moreover, Congress has not directly addressed whether a nasal gel is a food, or whether route of administration of an article affects its classification as a food or drug. Accordingly, substantial deference to the FDA's interpretation of the statute is warranted, so long as its interpretation is based on a permissible construction of the statute:

> [where] the court determines [that] Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782 (footnotes omitted). *See also B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1205 (2d Cir. 1992); *Am. Health Prods.,* 574 F.Supp. at 1501 (the FDA's interpretation that starch-blockers are drugs "merits substantial deference") (citing *Weinberger,* 512 F.2d at 701–02).

■ In determining whether a construction is permissible, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted ... or even the reading the Court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Rather, a permissible construction of the statute is one that "reflects a plausible

construction of the plain language of the statute and does not otherwise conflict with Congresses' expressed intent." *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991). Moreover, the court "may not substitute its own construction of a statutory provision for a reasonable interpretation" made by the agency. *Id.,* 467 U.S. at 844, 104 S.Ct. at 2782.

■ Here, the FDA's determination that the term "food" in sections 321(g)(1)(C) and 321(f)(1) is to be interpreted according to the ordinary meaning of the term, and is to include foods that provide nutrition by enteral administration into the gastrointestinal tract—in other words, that the food is ingested—, is a permissible construction of the statute: it reflects a plausible construction of the plain language of the statute, and does not conflict in any way with the limited Congressional intent that can be gleaned regarding sections 321(g)(1)(C) and 321(f)(1).

In addition to contending that the FDA has impermissibly used ingestion as a factor in determining that Ener–B is a not a food, Nature's Bounty makes two more claims in support of its contention that the FDA's determination is unreasonable. These are: (i) adopting the FDA's and Judge Ross's interpretation would render all dietary supplements in tablet and capsule form as drugs, because they are not "foods" in the common sense meaning of the term; and (ii) the FDA's interpretation of the word "food" is in direct contradiction to the agency's determination that nasal, esophagal and jejunal tubes used to feed people are "food," even though these methods cannot be considered "ingesting food" in the common, everyday meaning of the term.

The Court finds these contentions unconvincing. The first claim is rendered moot by the DSHEA, because under the DSHEA vitamins, minerals and other dietary supplements are expressly deemed to be a "food" within the meaning of the FDCA. *See* DSHEA § 3(a) (codified at 21 U.S.C.A. § 321(ff) (West Supp.1994)). Moreover, in order to ensure that a dietary supplement is not regulated as a drug under section 321(g)(1)(C), the DSHEA amends section

321(g)(1) and related labelling provisions of the FDCA to expressly provide that a dietary supplement cannot be regulated as a drug under section 321(g)(1)(C) on the basis of any claims in its labelling regarding benefits related to a disease or the process by which the supplement affects the structure of the body, provided the claim is truthful and not misleading. *See* DSHEA §§ 6 and 10 (codified at 21 U.S.C.A. §§ 343(r)(6) and 321(g)(1) (West Supp.1994)).

With regard to the second claim, the Court believes that the defendant is confusing different definitions of "food" under the FDCA. The FDCA establishes a separate category of "medical foods" in order to accommodate the enteral feeding and dietary management of people who are ill or injured. The definition of a "medical food" provides in relevant part: "[t]he term medical food means a food which is formulated to be consumed or administered enterally under the supervision of a physician[.]" 21 U.S.C.A. § 360ee(b)(3) (West Supp.1994). In the Court's view, there is no contradiction between Congress's special designation of a food that is formulated for enteral administration through devices such as nasal, esophagal or jejunal tubes to be a "medical food," and the FDA's determination that Ener–B is not a "food" because it is not "ingested." In the former case, Congress simply created a special category of "food," notwithstanding the unconventional method of delivery into the body, in order to serve a special medical purpose.

Moreover, the statute's premising of a "medical food" on enteral administration undercuts the defendant's contention that a parenterally administered nutrient like Ener–B should also be considered a "food." The regulatory interpretation of "medical food" makes it very clear that if the nutrient is not administered enterally, it is not a food: "[p]arenteral nutrients ... are drugs and not medical foods. By definition, medical foods are consumed or administered enterally." 56 Fed.Reg. 60377–78 (Nov. 27, 1991). *See also id.* ("enteral nutrition is defined as nutrition provided through the gastrointestinal tract, taken by mouth or provided through a tube[.]").

Accordingly, the FDA's determination that Ener–B is neither a "food" within the parenthetical exception of section 321(g)(1)(C) nor within the definition of that term in section 321(f)(1) is reasonable. Certainly, the FDA's determination is not "so directly in conflict with the statutory definition, [that] it must be invalidated as arbitrary and capricious and not in accordance with law." *Mathews*, 557 F.2d at 336. As a result, the Court determines that Judge Ross was correct in recommending that the Court defer to the FDA's determination and interpretation of the statute.

### 4. Other Alleged Improper Bases for Judge Ross's Report.

Nature's Bounty raises several other alleged bases for objecting to Judge Ross's Report. These are: (i) Judge Ross based her conclusions on "*post hoc* rationalizations" reflecting an alleged changed litigation position by the Government subsequent to the denial of its summary judgment motion; (ii) Judge Ross erroneously relied on prior agency actions as indicative of consistent FDA policy; and (iii) Judge Ross improperly based her recommendations on alleged safety concerns regarding Ener–B.

#### (i). *Changed Agency Litigation Position.*

Nature's Bounty objects that Judge Ross erred by ignoring "the fact that plaintiff has substantially altered its litigation position" since the denial of the Government's summary judgment motion in October, 1991. Objections at 6. According to Nature's Bounty, the Government's present contention that food must be enterally administered into the gastrointestinal tract is an abandonment of its "key argument" at the time of its summary judgment motion, namely that food must be absorbed into the stomach. *See also id.* at 40. Nature's Bounty characterizes this alleged alteration as a "pure *post hoc* rationalization." Indeed, Nature's Bounty goes as far as claiming that this alleged *post hoc* rationalization "has no resemblance to FDA's original position as expressed in its response to Nature's Bounty Citizen Petition." Objections at 41.

The Court finds this objection to be ludicrous, and agrees with Judge Ross that it "finds no support in the record." *Report* at 20. The FDA's response in May, 1988 to Nature's Bounty's Citizen Petition, *see* Plaintiff's Ex. 5, at 25–34, *is identical* to the Government's position before Judge Ross and this Court. In rejecting the exact same contentions raised in Nature's Bounty's Citizen Petition that are raised here regarding why Ener–B should be classified as a food, the FDA relied on the common meaning of the term "food" to interpret section 321(g)(1)(C), and particularly relied on the notion that the common use of the term "food" includes ingestion:

As discussed fully below, the Agency disagrees with each of the petition's arguments. An article intended to affect the structure or function of the human body is a drug under Section 201(g)(1)(C) of the Act unless it is a food. The case law supports the Agency's position that the "other than food" exception in Section 201(g)(1)(C) must be given a common sense definition and is limited to food substances that are ingested (and thus absorbed into the body through the alimentary canal). The language and legislative history of Section 411 further support this position. Because Ener–B is absorbed through the nasal mucosa directly into the circulatory system and is not ingested, it does not fit the common sense definition of food. Because it is not intended for common sense food use and because it is intended to affect the structure or function of the human body, it is properly regulated as a drug. FDA has been consistent in regulating similarly absorbed products as drugs.

. . . .

Therefore, even if labeled as a dietary supplement, a vitamin B–12 (cyanocobalamin) product intended for intranasal transmucosal absorption would satisfy the definition of drug.

FDA Response to Nature's Bounty's Citizen Petition, dated May 24, 1988, Plaintiff's Ex. 5, at 27–28.

In the Court's view, Nature's Bounty is being disingenuous by relying on the statement in the Government's memorandum of law supporting its motion for summary judgment that "food must be absorbed in the stomach," as evidence of the FDA's prior position. Nature's Bounty cites this statement out of context. The entire passage within which this statement appears demonstrates that the Government's position has not changed in any way since the government moved for summary judgment:

Nasal Gel is also "not a food." . . . [Section 321(f)(1)] includes "articles used by people in the ordinary way most people use food—primarily for taste, aroma or nutritive value." The simple fact is that Nasal Gel is not used by people in the ordinary way that they use food. It is absorbed through the nasal passage . . . . As a general rule, articles that unquestionably constitute foods are not applied topically to any part of the human body but rather are placed in the mouth, chewed, swallowed, digested and absorbed through the stomach. Indeed, consumption for absorption in the stomach is the only method of administration by which an article can be recognized as a food.

Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, docket file no. 5, at 13.

Nature's Bounty also contends that the deposition testimony of Dr. Gloria Troendle, M.D., Deputy Director of the FDA's Division of Metabolic and Endocrine Drug Products Center for Drug Evaluations, agrees with the defendant's interpretation of the statute and allegedly conflicts with the Government's present position.

The Court finds however, that Nature's Bounty selectively quotes Dr. Troendle's testimony in order to support its position, and that when her testimony is read in its context and in its entirety her testimony is consistent with the Government's position before the Court. For example, Nature's Bounty states that Dr. Troendle admitted that Ener–B was a nutritional supplement regardless of route of entry. However, the defendant neglects to point out that in admitting to this, Dr. Troendle also opined that Ener–B was not a food:

Q. Do you agree with the statement that "Without reference to a specific disease, Ener–B, regardless of route of entry, may be viewed as a nutritional supplement"?

A. Yes, but I don't think that it is a food. Deposition of Gloria Troendle, M.D., at 101 line 17, Defendant's Ex. W. Significantly, Dr. Troendle repeatedly states during her deposition that enteral administration of an article is essential to its being classified as a food. *See e.g.,* Troendle Deposition at 78, Plaintiff's Ex. 20F at 6–7 (if "it is a nutrient and administered orally ... it fits my idea of a food."; orally means "through the mouth" and "into the gastrointestinal tract."); *id.* at 10 (parenteral nutrition such as injectable vitamins and intranasal vitamins are "all drugs" because "they bypass the gastrointestinal tract ... [and] are not treated the same way as food by the body.").

In sum, the Court finds that the FDA's reasons for classifying Ener–B as a "drug" and not a "food" are not different from the reasons expressed in its response to Nature's Bounty's Citizen Petition. Nor does the Court believe that the FDA's reasons have been altered from the time the Government's summary judgment motion was denied. Moreover, the testimony of Dr. Troendle is consistent with, and does not contradict or conflict with, the FDA's reasons. The FDA's current position that food must be ingested is not, therefore, a *post hoc* litigation strategy fabricated by the FDA.

#### (ii). *Prior Agency Actions.*

Nature's Bounty also contends that Judge Ross erred in her determination that there has been a consistent FDA policy not to regulate parenterally administered vitamins as foods, by relying on prior agency actions regulating injectable vitamins and amino acids as drugs. According to Nature's Bounty, the FDA did not base its regulation of injectable vitamins and amino acids on their route of administration, but rather on their intended use to treat disease. As a result, Nature's Bounty contends that the FDA's regulation of these injectables cannot form the basis of deferring to the agency's interpretation with regard to classifying Ener–B as a "drug."

In this Court's view, this objection is also without merit. The Aminoplex Notice very clearly indicates that the FDA considered Aminoplex not to be a "food" because of its route of administration. *See* 52 Fed.Reg. 25072 (July 2, 1987). For example, the Notice states that historically "amino acids, minerals, vitamins, dextrose, and electrolyte products, singly or in combination, intended as injectables have been regarded as drugs by the medical profession, by FDA, and by the regulated industry for more than 40 years." The Notice then cites to four publications from the medical, pharmacological and trade communities that "support the history of drug status of injectable nutrients." Next, the Notice explains that the definition of "food" in section 321(g)(1)(C) is construed by the common meaning of the word: "food is commonly consumed, taken into the body by mouth, not by injection." Indeed, the Notice relies on the ruling in *Am. Health Prods.* to support the FDA's interpretation of "food," and concludes by stating that section 321(g)(1)(C) applies to the regulation of Aminoplex, while "the parenthetical phase '(other than food)' has no importance here." 52 Fed.Reg. at 25073.

Likewise, the FDA Vitamin/Mineral Task Force's Conclusions and Recommendations dated October 8, 1981, *see* Plaintiff's Ex. 5A, evidences the FDA's intent to treat ingested vitamins as foods, and injected vitamins as drugs. As Judge Ross noted at page 20 of her Report, the Task Force was established to develope FDA policies dealing with the regulation of "orally ingested vitamin/mineral preparations for use in humans," in light of the Proxmire Amendments to the FDCA. The Task Force recommended that "the agency treat virtually all ingested vitamin/mineral products for humans as foods," and explained that the recommendation "does not apply to injectable or topical vitamin/mineral preparations." *See* Plaintiff's Ex. 5a, at 3.

In addition, the Court believes that the FDA Notice regarding the Drug Efficacy Study Implementation ("DESI"), 49 Fed. Reg. 36447 (Sept. 17, 1984), also evidences an

FDA policy to regulate parenterally administered nutrients as drugs. In the DESI Notice, the FDA revoked a temporary exemption from regulation as drugs of certain multivitamin drug products administered intravenously or by injection. Nature's Bounty is correct to assert that the basis of the agency's action to regulate these products as drugs was the intent to use the products to treat ill people in a hospital. However, despite the intended use of these products, the Court believes that their regulation as drugs is not inconsistent with FDA's regulation of other parenterally administered nutrients as drugs. Nature's Bounty's claim of inconsistency with respect to the DESI Notice would be stronger if the products had been regulated as foods.

As the Government correctly states, Nature's Bounty has not shown one example of the FDA regulating a parenterally administered product as a "food." In the Court's view, the FDA has consistently treated such products as drugs, and the agency's denial of Nature's Bounty's Citizen Petition to treat Ener–B as a food is consistent with the FDA's policy and prior actions in this area.

(iii). *Safety Concerns.*

Nature's Bounty claims that "a substantial part" of Judge Ross's Report is devoted to a discussion of safety concerns. Objections at 34. According to the defendant, the safety of a product can never be used as a basis for classifying it as a drug or food. Nature's Bounty contends, therefore, that to the extent Judge Ross's Report relies on safety concerns regarding absorption of vitamins through the nasal mucosa, it must be disregarded.

The Court also finds this objection to be disingenuous. The statement that a substantial part of Judge Ross's Report is devoted to discussing safety concerns is hyperbole. In discussing evidence presented at the hearings on the different physiologies of the gastrointestinal tract and respiratory system, Judge Ross devotes one page to describing testimony from both parties' experts concerning different routes of administration of a vitamin and possible toxicity effects. This discussion is in a section of the Report summarizing the Evidentiary Hearing. In the Court's view, Judge Ross did not substantially rely upon the safety concerns in arriving at her determination. Rather, in concluding that the FDA was correct in classifying Ener–B as a drug Judge Ross relied upon the interpretation of section 321(g)(1)(C) by the Second Circuit, and on the reasonableness of FDA's determination that ingestibility is a legitimate criterion to consider when classifying a certain item as a "food" in the common-use meaning of the term.

### 5. Evidence that Ener–B is a Food.

Nature's Bounty contends that Judge Ross also ignored testimony and "overwhelming" evidence which conclusively demonstrates that Ener–B is a food. According to Nature's Bounty, Ener–B is intended to deliver vitamin B–12 for nutritive value, and the vitamin B–12 supplied by Ener–B to the body serves the same food function as vitamin B–12 obtained from any other food source.

It is the Court's view that, like the defendant's other objections the present one is grounded on a misconception of Judge Ross's determination. Based on the evidence adduced at trial, Judge Ross determined that the common use meaning of "food" consisted of two elements: delivering nutrition to the body, and ingestion into the gastrointestinal tract. *See* Report at 7–9. The fact that Ener–B functionally delivers vitamin B–12 just like any other source of vitamin B–12 is, therefore, not enough to categorize it as a "food" within the meaning of section 321(f)(1) or the parenthetical exception to section 321(g)(1)(C). In addition to providing nutrition, Ener–B must be ingested. Ener–B is not ingested. It is delivered parenterally. Accordingly, because it does not meet the common use definition of a "food" it does not fall within the "(other than food)" exception to section 321(g)(1)(C), no matter how closely to other food sources it delivers vitamin B–12 into the body.

The defendant's objections, therefore, that Judge Ross neglected "extensive" and "overwhelming" testimony supporting the classification of Ener–B as a food, and that Judge Ross "merely abstracted" from the record

**402**

those portions of the testimony which supported the Government's claims, are inaccurate and without merit.

### 6. FDA's Failure to Enforce Sublinguals.

■ Nature's Bounty objects that Judge Ross erred in rejecting Nature's Bounty's claims that the FDA has discriminated against it, in that the FDA has failed to bring enforcement proceedings similar to the present one against Nature's Bounty's competitors who manufacture sublingual vitamin B-12 products. Sublinguals are placed under the tongue and are absorbed by the buccal and sublingual membranes of the mouth. The FDA considers sublingual tablets not to be food, but unapproved new drugs. Nature's Bounty contends that despite considering sublinguals as unapproved new drugs, the FDA has not done anything in the past eight years to stop sublinguals from being sold on the open market. According to Nature's Bounty, the FDA's selective enforcement against Ener–B constitutes discrimination.

The Court finds no error in Judge Ross's conclusion that the FDA's decision not to take any enforcement action against the vitamin B-12 sublingual manufacturers is a matter within the agency's discretion that is immune from judicial review. *See Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce ... is a decision generally left to an agency's absolute discretion," and unsuitable for judicial review). The FDA's classification of sublinguals as drugs is not inconsistent with the agency's determination that Ener–B is a drug. Although the FDA has not brought enforcement proceedings against sublingual manufactures, there are a variety of reasons why the FDA may have decided not to do so, *see id.* at 831–32, 105 S.Ct. at 1655–56 (citing rationale for why an agency may not pursue enforcement proceedings), *B.F. Goodrich,* 958 F.2d at 1205 (decisions regarding enforcement discretion by the Environmental Protection Agency reflect limited agency resources, enforcement priorities and other administrative constraints),

and the Court will not second-guess the agency's decision. *See Heckler,* 470 U.S. at 832, 105 S.Ct. at 1656 (the concerns regarding the impropriety of judicial review of an agency's decision not to bring an enforcement action also underlie the principle of administrative law that courts generally defer to the agency's construction of the statute it is charged with implementing).

Nature's Bounty attempts to distinguish the FDA's action here from the FDA's action in *Heckler,* by contending that unlike the situation in that case where the FDA had not promulgated a rule or taken any action with regard to the drugs at issue, here the FDA has taken action. According to Nature's Bounty, the FDA's "action" is in the form of its inaction. By not taking any action with respect to sublinguals as drugs, Nature's Bounty contends that the FDA is implicitly acting to regulate these products as a food. The defendant calls this a "negative" regulatory approach. The Court rejects Nature's Bounty's reasoning, because as stated above, there are many reasons why the agency may have decided not to bring enforcement actions against the sublingual manufacturers, and these reasons cannot be willy-nilly equated as tantamount to regulating sublinguals as a food.

### 7. Evidentiary Objections.

Nature's Bounty objects to three evidentiary rulings by Judge Ross. The first objection concerns a post-hearing motion by the defendant to attempt to supplement the record. Nature's Bounty's motion sought to include in the record: (1) an affidavit from Dr. Raymond Brown, one of Nature's Bounty's witnesses, allegedly rebutting the testimony of Dr. Clifford Wayne Callaway, a Government witness; (2) deposition excerpts by Dr. John Hathcock, a Government witness, concerning the natural diffusion process that occurs across the nasal and intestinal membranes; and (3) excerpts from a learned treatise on nutrition allegedly written by Dr. Victor Herbert, one of the Government's witnesses, for the purpose of correcting testimony offered by Dr. Calabrese, a witness for the defendant.

The second objection concerns Judge Ross's denial of Nature's Bounty's request to call all seven of its expert witnesses. Each of the seven experts had submitted affidavits in conjunction with Nature's Bounty's opposition to the Government's summary judgment motion. Only four of the experts were allowed to testify. Judge Ross denied this request on the ground that it would be repetitious of the testimony by the four experts already offered.

The third objection concerns Judge Ross's denial of the defendant's request to offer into evidence a panel report by 24 purported scientific experts who signed statements attesting to Ener–B's nature as a food and dietary supplement. Judge Ross rejected the defendant's request, on the ground that it had not been prepared until after the FDA commenced the present actions.

The Government contends that each of these objections is devoid of any merit. If the Court should grant the objections, however, the Government requests that the Court also accept evidence by the Government in response to the submissions by Nature's Bounty.

■ In the Court's view, Judge Ross correctly denied each of the evidentiary requests. Moreover, the Court believes the subject matter of the evidence, even if introduced at the hearing, is not pertinent to the main issue before the Court and would not alter Judge Ross's determination and final recommendation. The affidavit of Dr. Brown is a surrebuttal to the rebuttal testimony of Dr. Callaway, concerning Ener–B absorption rates as extrapolated from a study conducted by Nastech Pharmaceutical Co. *See* Defendant's Ex. V. The defendant should have raised the subject matter in Dr. Brown's affidavit at the time Dr. Callaway testified. Moreover, the conclusions in Dr. Brown's affidavit concerning Ener–B's absorption rate are not particularly relevant, because the crucial issue in this case concerns Ener–B's not being ingested into the gastrointestinal tract.

■ Similarly, the declarations of Dr. Hathcock and the excerpts from the book on nutrition allegedly written by Dr. Herbert, should have been read into the record at the time of the hearings and presented to Dr. Calabrese at the time he testified. Dr. Hathcock's declarations were included in the Government's pre-hearing Rule 3(g) statements and known to the defendant. His declarations are also not particularly relevant, because like the conclusions in Dr. Brown's affidavit, they concern the absorption process of Ener–B. With regard to the excerpts from Dr. Herbert's book, Nature's Bounty had the opportunity before the record closed to review the book, and it could have offered the relevant excerpts prior to the end of the hearing. It chose not to do so, and the Court declines to allow it to do so at this time.

■ The Court also finds no error in Judge Ross's denial of the defendant's request to call all seven of its experts. Indeed, a review of the record and transcript indicates that Nature's Bounty *agreed* to limit its witnesses to four experts, after discussing with Judge Ross and the Government which of the witness' testimony would not be duplicative. *See* Tr. at 1091–92. Fed.R.Evid. 403 permits a judge to exclude relevant evidence that is cumulative, duplicative and repetitious in nature, and nowhere in the transcript is there any indication that Nature's Bounty sought to show that the testimony of the additional witnesses would not be cumulative or repetitious.

■ With regard to the signed statements of the twenty-four experts, the Court believes that these were also properly excluded. These statements were offered as evidence of Nature's Bounty's intent to market Ener–B as a food. *See* Tr. at 1173–74. However, as explained earlier in this Opinion, a manufacturer's intent to distribute a product as a food is not determinative of whether the product is a "food" within the meaning of section 321(g)(1)(C).

## THE GOVERNMENT'S MOTION FOR DISGORGEMENT

■ Although not a part of the proceedings before Judge Ross, the Court will rule on the Government's request that an order be issued requiring Nature's Bounty to disgorge the profits it has earned from sales of

Ener–B, in order to comprehensively resolve the issues presented by the parties in these two cases. The Government's request for disgorgement is set forth in the memorandum of law supporting its motion for summary judgment in September, 1991, and was reiterated during the oral argument of the objections to Judge Ross's Report.

Section 302(a) of the FDCA, 21 U.S.C.A. § 332(a) (West Supp.1994), provides in relevant part that the district court "shall have jurisdiction for cause shown to restrain violations" of the Act. Although the FDCA does not expressly authorize the Court to impose the remedy of disgorgement against a company violating the Act, the Government asks that this Court read section 332(a) as authorizing the district court to exercise the full panoply of equitable powers it inherently possesses in order to remedy violations of the Act, including the power to order disgorgement.

In support of its position, the Government relies primarily upon *Mitchell v. Robert De-Mario Jewelry, Inc.,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) and *Commodity Futures Trading Commission v. British Am. Commodity Options Corp.,* 788 F.2d 92 (2d Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986). In *Mitchell,* the United States Supreme Court construed the jurisdictional provision in section 17 of the Fair Labor Standards Act ("FLSA"), which provides that the district court has jurisdiction for cause shown to restrain violations of the FLSA. The Supreme Court held that the provision authorizes the district court to exercise all of its inherent equitable powers, including the power to order reimbursement of wages by the employer to employees who were discharged in violation of the statute. *See id.,* 361 U.S. at 291–92, 80 S.Ct. at 334–35. In *British American,* the Second Circuit held that in the securities context, disgorgement of profits is an appropriate remedy where there has been fraud and regulatory violations. *See id.,* 788 F.2d at 94.

The Court finds the Government's reliance upon these cases to be inapposite. The application of the ruling in *Mitchell* to violations of the FDCA was rejected in *United States v. Superpharm Corp.,* 530 F.Supp. 408, 410 (E.D.N.Y.1981). In that case, the court held that the jurisdictional provision to restrain violations of the FDCA in section 332 could not be construed to allow equitable relief in the form of the court ordering the recall of an illegally marketed drug. The court determined that the legislative history concerning the enforcement scheme set forth in sections 332–334 of the FDCA indicates that Congress intended seizures to be the most drastic remedy under the Act, and that injunctions were meant to alleviate the hardship of seizures to the manufacturer or distributor. *Id.* at 410. *Accord Hygrade Food Prods. Corp. v. United States,* 160 F.2d 816, 819 (8th Cir.1947) (the injunctive jurisdiction under section 332 is limited to restraining the delivery of illegal, adulterated or misbranded products into interstate commerce, and not for the punishment of wrongful acts already committed).

The *Superpharm* court further held that *Mitchell* was distinguishable from the case before it, because in *Mitchell* the injunctive relief requested was required in order to accomplish the purpose of the legislation. However, in *Superpharm,* the seizure and other enforcement mechanisms of the FDCA sufficed to accomplish the purposes of the FDCA. *See Superpharm,* 530 F.Supp. at 410. This Court believes the same considerations are applicable here to distinguish *Mitchell.* The purposes of the FDCA are served here by the FDA's seizure and the permanent injunction which will be issued in connection with the Court's Opinion. Disgorgement, in the Court's view, will only serve a punitive purpose and is not appropriate or necessary.

The facts in *British American* also distinguish that case from the present one. In *British American* profit disgorgement was ordered with regard to a commodities broker who had, among other things, knowingly violated the Commodities Futures Trading Commission's ("CFTC's") registration regulations. However, disgorgement was ordered with respect to the regulatory violation only from the time the regulations went into effect. *See id.,* 788 F.2d at 94 n. 2. In this case, Nature's Bounty did not knowingly violate a clear cut, express statutory provision

or regulation as did the commodities broker in *British American*. Rather, in good-faith it construed the application of an ambiguous statute to Ener–B differently than did the FDA. The Court believes that, in light of Nature's Bounty's good-faith, the statute's ambiguity and the lack of any promulgated rule or interpretive guideline regarding nasally administered vitamins, it would be unfair to impose disgorgement on Nature's Bounty.

In sum, it is not clear to this Court that it has the authority under section 332 to exercise its inherent equitable powers and order the disgorgement of profits by Nature's Bounty resulting from its sales of Ener–B. However, assuming *arguendo* that the Court does have the authority to do so, the Court declines to order disgorgement, in the exercise of its discretion, because it would be unfair to Nature's Bounty. In the Court's view, this case does not involve the type of situation extant in *Mitchell* and *British American* where the extraordinary use of the Court's equitable powers was warranted.

### CONCLUSION AND ORDER

In the modern technocratic state where regulatory implementation and enforcement of scientifically technical and complex legislation is delegated to administrative agencies, the courts must beware of usurping the prerogative of Congress that permits the agencies in the first instance to interpret legislation concerning the subject matter of their expertise.

The issue raised by the present cases is novel, and has not been squarely addressed by Congress in either the language of the statute or in the deliberations of Congress prior to enacting the legislation. Deference to the FDA's interpretation of the statute is, thus, appropriate. Perhaps some day in the future, as Nature's Bounty predicts, society will cross a threshold where administration of vitamins via a nasal gel will be as commonplace as the taking of vitamin tablets is today. At that time, Congress and/or the FDA may wish to regulate Ener–B as a food or dietary supplement. However, until that time the Court believes it is not this Court's function to do so.

Judge Ross correctly concluded that the FDA's interpretations of the statutory provisions in this case were reasonable, and that deference was warranted to the FDA's determination that Ener–B is a drug, and not a "food" within the parenthetical exception to 21 U.S.C. § 321(g)(1)(C) because it is not ingested. The Court finds that in reaching this conclusion, Judge Ross did not err legally or factually, nor did she base her conclusion on any legal or factual error. The Court, therefore, adopts the Report and Recommendation of Judge Ross in its entirety without qualification.

Accordingly, it is the determination of this Court that Ener–B is not a food, but rather is a drug within the meaning of 21 U.S.C. § 321(g)(1)(C). Moreover, Ener–B is a new drug within the meaning of 21 U.S.C. § 321(p) that is unapproved, and therefore subject to condemnation under 21 U.S.C. § 334.

For the reasons stated above, it is hereby

**ORDERED,** that the Report and Recommendation of Judge Ross dated September 23, 1994 is adopted in all of its aspects; it is further

**ORDERED,** that the defendant's objections to Judge Ross's Report and Recommendation are overruled; it is further

**ORDERED,** that the defendant Nature's Bounty, and each and all of its officers, agents, servants, employees, successors, assigns, attorneys, all persons in active concert or participation with any of them, and all other persons who receive notice of this order are hereby *permanently* restrained and enjoined under the provisions of 21 U.S.C. § 332(a) from introducing or delivering for introduction into interstate commerce Ener–B nasal gel or any other nasally administered nutrient, or any other product purporting to be the same as Ener–B, unless and until there is in effect a new drug application that has been reviewed and approved by the Food and Drug Administration pursuant to 21 U.S.C. § 355, which authorizes the manufacture, use, and distribution of, and claims and representation associated with such new drug; it is further

**ORDERED,** that the defendant Nature's Bounty shall provide a copy of this order to each officer, director, and employee of Nature's Bounty, Inc. within 20 days of the date of entry of this order by the Court, and shall provide plaintiff with an affidavit of compliance within 40 days of such entry stating the fact and manner of compliance, and identifying the names and positions of all persons so notified; it is further

**ORDERED,** that the defendant shall post a copy of this order in the employee common area at Nature's Bounty, Inc. within ten days of the entry of this order, and shall ensure that the order remains posted for the period of one month; it is further

**ORDERED,** that the plaintiff's motion for a preliminary injunction is deemed moot, in light of the permanent injunction issued by the Court; and it is further

**ORDERED,** that the plaintiff's motion for disgorgement of profits is denied, and as a result the pending objections by Nature's Bounty to the order of United States Magistrate Judge Simon A. Chrein compelling the defendant to respond to the Government's discovery requests, is deemed moot.

The Clerk of the Court is advised that this action closes cases CV 88–3000 and CV 90–1635.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

ROSS, United States Magistrate Judge:

These companion cases present the issue whether, under the Federal Food, Drug, and Cosmetic Act (hereinafter "the Act"), the Food and Drug Administration (hereinafter "FDA") should, under 21 U.S.C. §§ 321(f) and (g)(1)(C), classify and regulate a nasally administered vitamin B–12 preparation called Ener–B as a "food" or as a "drug." More specifically, they pose the question whether, under the Act, the FDA may consider the route of administration of a product in determining its classification, or whether it must look solely to the product's function as a nutrient. Following denial of the government's motion for summary judgment on the issue, the Hon. Arthur D. Spatt, United States District Judge, concluded that the determination would be "enhanced by expert assistance" and referred the matters for an evidentiary hearing at which such expert testimony could be adduced. Having conducted the requested hearing, and for the reasons set forth below, I recommend that the court adopt the FDA's view that the route of administration is a permissible criterion in classifying products under the Act; specifically, in classifying products as "food ... for man;" and that the court find that the FDA is therefore permitted to regulate Ener–B as a drug.

## PROCEDURAL HISTORY

Since 1986, Nature's Bounty, Inc. (hereinafter "Nature's Bounty"), a manufacturer and distributor of dietary supplements and vitamins, has marketed a vitamin B–12 dietary supplement, Ener–B. Ener–B is administered by placing drops of the gelatinous substance on the mucous membrane of the inner wall of the nose, thus delivering the vitamin by absorption directly into the bloodstream rather than by ingestion and absorption through the alimentary tract. By letter dated February 28, 1987, the FDA notified Nature's Bounty that it had determined, in part based on Ener–B's method of administration, that Ener–B was a new drug under § 201(p) of the Act, 21 U.S.C. § 321(p), which lacked an approved new drug application in violation of § 505 of the Act, 21 U.S.C. § 355. The FDA thus demanded that Ener–B's marketing be discontinued. Nature's Bounty responded that it would not cease selling the product. Thereafter, on March 24, 1987, FDA inspectors collected samples of Ener–B from Nature's Bounty's facility.

Ten days later, on April 3, 1987, Nature's Bounty filed a Citizen's Petition with the FDA, pursuant to 21 C.F.R. § 10.30 (1989), asking, among other things, that the agency classify under the Act nutritive dietary substances generally, and its product Ener–B in particular, as "foods," without regard to route administration, because their function is to provide nutrition. Nature's Bounty further requested a stay of any contemplated enforcement proceeding against Ener–B in favor of administrative resolution of the is-

sues. Ex. 5, pp. 4–23. On May 24, 1988, the FDA filed its formal response denying the Citizen's Petition. In summary, the agency based its denial on the view that the classification "food" under the governing provisions of the Act,

> must be given a common sense definition and is limited to food substances that are ingested (and thus absorbed into the body through the alimentary canal) ... Because Ener–B is absorbed through the nasal mucosa directly into the circulatory system and is not ingested, it does not fit the common sense use and because it is intended to affect the structure or function of the human body, it is properly regulated as a drug. FDA has been consistent in regulating similarly absorbed products as drugs.

Ex. 5, pp. 27–28.

On September 28, 1988, the United States instituted an *in rem* proceeding, pursuant to 21 U.S.C. § 334, seeking to condemn, under 21 U.S.C. § 355(a), the Ener–B previously seized from Nature's Bounty as a "new drug" within the meaning of 21 U.S.C. § 321(p), for which no new drug application had been approved, 21 U.S.C. § 355(b). Nine months later, on May 11, 1990, the government brought the second action against Nature's Bounty *in personam*, seeking to enjoin Nature's Bounty permanently from selling Ener–B, pursuant to 21 U.S.C. § 332, in part, on the ground that it is an unapproved "new drug" as alleged in the first proceeding.

### THE EVIDENTIARY HEARING

During the course of the five day evidentiary hearing, seven expert witnesses were called, three by the government and four by the claimant/defendant. Without lengthy recitation of their respective educational and professional backgrounds, it is sufficient to observe, based on their curriculum vitae and testimony, that all experts called were highly qualified.[1] Further, although their lengthy testimony covered multiple subjects potentially bearing upon the resolution of the central issue, it suffices to distill from the record only such expert evidence as is necessary for a determination of that issue under the applicable provisions of the Act and controlling case law.

The Act defines as a "drug" any article "other than food," which is intended to "affect the structure or function of the body of man or other animals." 21 U.S.C. § 321(g)(1)(C). It also defines as "food," *inter alia*, "articles used for food or drink for man or other animals." 21 U.S.C. § 321(f)(1). The central issue addressed by the experts, therefore, was the meaning of "food ... for man;" that is, whether, as the FDA argues, ingestion into the gastrointestinal tract (enteral administration, as distinguished from parenteral administration,[2] which entails absorption other than via the gastrointestinal tract) is a necessary (albeit insufficient) component of the definition, or whether that definition hinges solely on the function of food to provide nutrition, rendering route of administration (be it enteral or parenteral) an impermissible criterion for classification under the Act.

### A. The Definition of "Food ... for Man"

In its response to the Citizen's Petition of Nature's Bounty, the FDA determined that route of administration is an essential component of the Act's definition of "food ... for

1. The three experts who testified for the government are Professor Robert E. Olson, Professor Emeritus of Medicine at the State University of New York at Stonybrook; Dr. Clifford Wayne Callaway, Associate Clinical Professor at George Washington University; and, Dr. John Hathcock, Director of the Division of Science and Applied Technology in the Office of Special Nutrition in the FDA's Center for Food Safety and Applied Nutrition. Nature's Bounty's four expert witnesses were Professor Raymond R. Brown, retired Professor Emeritus at the University of Wisconsin Medical School; Dr. Edward James Calabrese, Professor of Toxicology at the School of Public Health at the University of Massachusetts in Amherst, Massachusetts; Richard S. Litman, M.D., an otolaryngologist (specializing in ear, nose and throat), who is both in private practice and an Assistant Professor at State University of New York at Stonybrook; and Dr. Judy Anne Driskell, Professor of Nutritional Science and Dietetics at the University of Nebraska.

2. Examples of parenteral administration include injectables (administration by injection) and topicals (administration by absorption).

man" in 21 U.S.C. § 321(f)(1). Specifically, the agency wrote:

> Even if Ener–B is used only for its nutritive value ... Ener–B is not a food because vitamin/mineral preparations absorbed through the nose are not used in the ordinary way most people use food.
>
> \* \* \* \* \* \*
>
> While it is true that certain animal species do absorb their food without alimentation, humans do not.... The Agency is unaware of any article that is commonly regarded as a food for human use that is not ingested and concludes that food for human use must be ingested.

Ex. 5, pp. 28, 29.

All of the experts who testified at the hearing agreed that the "common sense" understanding of "food ... for man" involves articles eaten or taken into the gastrointestinal tract via the mouth. Government expert Dr. Hathcock testified that food for humans is "an article that is consumed into the gastrointestinal tract for processing in the usual physiological manner to provide nourishment." Tr. at 326. All four of the defense expert witnesses agreed that the "common sense," non-scientific meaning of "food" entails taking nutrients into the gastrointestinal tract. Thus, at his deposition, Dr. Brown, one of the Nature's Bounty experts, acknowledged that the term "foods ... [is] generally used ... to mean things that are eaten." Tr. at 537, quoting Brown deposition transcript at 44. Similarly, Dr. Calabrese, another defense expert, acknowledged at his deposition that "people in our society have been brought up and raised" to consider "food" as "that which is ingested into the gastrointestinal tract." Tr. at 858–59, quoting Calabrese deposition transcript. Dr. Driskell, also a Nature's Bounty expert, conceded at her deposition that "normally" the "generally accepted definition of food" is "the nutrients ... we usually eat [that] are taken into the gastrointestinal tract." Tr. at 1003–04, quoting Driskell deposition transcript at 118–19. _See also,_ testimony of defense expert Dr. Littman, Tr. at 662–63.[3]

Additionally, all of the government experts attested and two defense experts acknowledged that the scientific definition of the term "food ... for man," as used by anatomists and physicians, entails two components: both nutrient value and ingestion into the gastrointestinal tract. Thus, government expert Dr. Callaway testified that:

> Foods comprise all the solid and liquid materials taken into the digestive tract that are utilized to maintain and build body tissues, regulate body processes, and supply heat, thereby sustaining life.

Tr. at 700, adopting the statement of Krause and Mann, _Food, Nutrition and Diet Therapy,_ Tr. at 699. The government's other witnesses concurred. _See_ Tr. at 326–27 (Hathcock) and Tr. at 40 (Olson). They also testified that although a nutrient may constitute a "food" for organisms without alimentary canals, it does not constitute a food for humans unless it is ingested into the gastrointestinal tract, by enteral administration. The nose, they stated, is not part of the foodway. Tr. at 40, 54–56 (Olson); Tr. at 330–31, 326–29 (Hathcock); Tr. at 698–700, 703 (Callaway).

---

**3.** The record contains much evidence concerning dictionary definitions of the term "food." Nature's Bounty proffered many definitions that focused solely on the function of food, such as that provided in _Dorland's Illustrated Medical Dictionary_ (26th ed. 1988) ("anything which, when taken into the body, serves to nourish or build up the tissues or to supply body heat; aliment; nutriment"). _See also, e.g.,_ definitions of food in the _American Heritage Dictionary_ (1976), _The Oxford English Dictionary_ (1933) and _The Random House Dictionary of the English Language_ (1983). In response, the government countered with dictionary definitions which not only speak of nutrient value but also make reference to route of administration and specifically ingestion. _See, e.g.,_ the _American Heritage Dictionary_ (1992) (defining "food" by reference to its nutrient value coupled with ingestion and assimilation, and defining "ingest" as "[t]o take into the body by mouth for digestion or absorption"). It is difficult to accord any weight to such definitions in this context, however, because, as the government observes, certain definitions are evidently generic ones, intended to apply to the entire plant and animal kingdom irrespective of whether the organism has an alimentary canal, while others are of narrower scope, contemplating only those animals, like man, that do possess an alimentary canal. For purposes of these proceedings, it is sufficient to observe that there exist both types of dictionary definition.

Two of Nature's Bounty's experts acknowledged on cross-examination that, according to doctors generally, food for humans must be taken into the gastrointestinal tract. On direct examination, defense expert Dr. Littman, an otolaryngologist (ear, nose and throat specialist), did not render an opinion as to whether Ener–B is a food or a drug. On cross-examination, however, he conceded that as otolaryngologists use the term, "food is not taken into the nose." Tr. at 633. Rather, the "passageway for food would include going into the mouth, into the oropharynx, where it would temporarily cross with the air[way] ... and down into the esophagus." Tr. at 657. Another defense expert, Dr. Brown, opined on direct examination that food is defined by its nutrient value and that Ener–B is therefore a "food." He agreed on cross-examination, however, that "taking in nutrients across the nasal mucosa" is "unusual," and that "as most doctors use the term 'foodway,' [it] does not include the nose." Tr. at 536. Further, Dr. Brown attested that the Krause and Mahan definition of food, which incorporates intake via the digestive tract, is a "reasonable statement." Tr. at 538.

The definition of food offered by the remaining two experts for Nature's Bounty included any substance with nutrient value, regardless of route of administration. Dr. Calabrese defined food as anything having nutrient value administered via any method. Tr. at 853. According to this definition, oxygen taken into the lungs is a food, as is the absorption of vitamins by injection, eye drops, or through the skin. Tr. at 853–54. Dr. Driskell defined food as "a substance that supplies the body with nourishment." Tr. at 961. At her deposition, however, as the government points out, Dr. Driskell proffered an inconsistent definition of food that excluded complex formulas containing measured amounts of nutrients. Tr. at 1000–03, quoting Driskell deposition transcript at 53, 118–19.

In sum, credible expert testimony offered at the hearing—both by the government's experts and, in noted respects, by defense experts—strongly supports the conclusion that common sense and scientific definitions of "food ... for man" that incorporate as a necessary element ingestion into the gastrointestinal tract are both reasonable and accepted by a substantial segment of the medical and scientific community. As evidenced by certain defense expert definitions, other respectable segments of the scientific community apparently adopt a more expansive definition that includes parenterally administered nutrients as well. This showing, however, does not impeach the evidence that a definition requiring enteral administration is reasonable and is also well accepted by credible scientists.

### B. The Physiology of the Gastrointestinal Tract and the Nose

At the hearing, the government adduced, through both learned treatises and the testimony of the experts, substantial evidence regarding the anatomy and physiology of the digestive and the respiratory systems. The testimony of the experts for Nature's Bounty, did not dispute—and even supported—this evidence.

Thus, the undisputed evidence is that the human body normally takes in foods and absorbs nutrients via the alimentary canal or gastrointestinal tract, commonly referred to as the "foodway" or "food canal." Consisting of the mouth, esophagus, stomach and small and large intestines, the foodway is designed for the digestion of food stuffs and the absorption of essential nutrients into the bloodstream. Tr. at 45–47 (Olson); 329–30 (Hathcock); 703 (Callaway); 535–38 (Brown); 656, 662–64 (Littman); 867 (Calabrese). It is also designed to regulate the amount of and rate at which nutrients or other compounds are absorbed into the body by means of specific transport mechanisms. These mechanisms respond to factors such as the adequacy and stores of the nutrient in the diet or whether the compound is toxic or indigestible. Tr. at 45, 58, 63, 82–84 (Olson); 335, 337–8 (Hathcock); 703–04 (Callaway); 1047 (Driskell). Such regulatory mechanisms include the "barrier and exchange functions" performed by the "brush border membrane" of intestinal cells known as "enterocyctes." Walcher and Kretchmen, *Food, Nutrition and Evolution*, Tr. at 58–59, 62, 75–76 (Olson); 335,

337–38 (Hathcock); 703–04 (Callaway); 597–98 (Brown); 663 (Littman); 870–71, 874–75 (Calabrese). They also include the transport of certain water soluble nutrients, such as vitamin B–12, via the portal vein directly to the liver, known as "first pass metabolism." There the compounds or nutrients are processed in various ways, which may involve changing, storing or directly excreting them into the bile before they are exported into the general blood circulation. Tr. at 99–101 (Olson); 335–36, 347–48 (Hathcock); 703–04, 712 (Callaway); 837–38 (Calabrese).

The evidence is also undisputed that the nose is part of the respiratory system, which includes, in addition, the nasopharynx, larynx, trachea, bronchioles and lungs. Tr. at 535–6 (Brown). The respiratory system evolved for the purpose of absorbing oxygen from the ambient air. Tr. at 663–64 (Littman). The nasal cavity is lined with respiratory mucosa similar to that which lines the other structures of the respiratory system. Tr. at 80 (Olson). This specialized mucosa is designed to "warm and moisten incoming air and remove inhaled particulate matter," making the air suitable for passage to the pulmonary alveoli of the lungs. Laing, Doty and Breipohl, *The Human Sense of Smell,* Tr. at 80–81, 54 (Olson); 707 (Callaway); 599–600 (Brown); 873–74 (Calabrese). The experts agreed virtually unanimously that the respiratory mucosa lining the nasal cavity are functionally dissimilar to the membranes lining the gastrointestinal tract. *See, e.g.,* Tr. at 707–08 (Callaway); 595 (Brown); 663–64 (Littman); 874 (Calabrese). Because parenteral administration bypasses the normal physiological safety mechanisms present in the gastrointestinal tract, the government's witnesses attested to the belief within the scientific and medical community that prior to the wide-spread dissemination of a parenterally administered product—for example, the application of Ener–B to the nasal membrane—it should be subjected to studies demonstrating its efficacy and safety as a drug. Tr. at 63–68, 72, 91–93 (Olson); 337–38, 346–47 (Hathcock); 705–09 (Callaway).

Indeed, although classifying Ener–B as a food, defendant's experts lent support to this conclusion. Dr. Brown acknowledged that whether Ener–B is drug is a question as to which reasonable scientists could reasonably disagree. Tr. at 545. He testified that "route of exposure can affect ... toxic[ity] because you are avoiding certain mechanisms in the gastrointestinal tract," Tr. at 589, including "the normal routes of controlled absorption and hepatic first pass metabolism," Tr. at 586. Therefore, regardless whether he considered Ener–B a drug, "as a scientist" he believed that Ener–B should not have been marketed "until well-controlled studies were done ... showing [its] efficacy and safety." Tr. at 606. Dr. Calabrese attested that he generally concurs that the toxicity of a vitamin may vary depending on route of exposure. Tr. at 883–84, 887–88. Dr. Driskell also conceded that "some route ... [of] exposure is important in considering toxicity," Tr. at 1051, and agreed that most nutritionists believe that the absorptive process which takes place in the gastrointestinal system "has some safety and effective[ness] purposes behind it." Tr. at 1047. Further, virtually all of the experts agreed that all substances, even essential nutrients, can be given in such doses that they become toxic. *See, e.g.,* Tr. at 61 (Olson); 335–347 (Hathcock); 703 (Callaway); 583 (Brown); 879 (Calabrese).

Ener–B is designed to bypass the gastrointestinal absorption barrier. As the product insert explains, it "is absorbed directly into ... [the] bloodstream," reaching peak serum concentration levels of B–12 "8.4 to 10 times higher" than in tablet form, and doing so much quicker, "in only 1.6 hours." Ex. 16; Tr. at 127 (Olson). Defense experts agreed with these product claims. *See* Tr. at 1048 (Driskell); 547–49, 557–58 (Brown). In fact, Dr. Brown testified that delivery of vitamin B–12 to the bloodstream nasally is similar to delivery by injection. The two methods of administration "produce the same effect in the blood," "in terms of the high [and early] peak level [of serum concentration, which] then even[s] out." Tr. 548–49. Dr. Brown contrasted this phenomenon with absorption in the gastrointestinal tract, which occurs at a slower rate, peaking only after approximately 25 hours, Tr. at 595, without "this huge peak level at the beginning." Tr. at 558.

The government's experts also testified about the functioning of a nasogastric tube, a device for the feeding of ill persons, which is introduced through the nose and delivers food to the gastrointestinal tract. The government experts explained that although the device is anchored in the nasal cavity to provide greater convenience and comfort for the patient, there is no contact between the tube's contents and the nasal mucosa. Rather, as the experts characterized it, the device is an "artificial esophagus" that delivers nutrients directly to the stomach. The food is thus digested and absorbed in the gastrointestinal tract, similarly to ingested food. Tr. at 57, 84–89 (Olson); 330 (Hathcock). Defendant's experts did not contradict the government's witnesses' explanations of the nature and function of a nasogastric tube.

Finally, pertinent to the parties' respective arguments, testimony was adduced concerning the physiology of absorption of so-called "sublinguals." These are tablets not intended to be ingested, but rather, to be held under the tongue for purposes of absorption directly into the blood stream by the sublingual buccal mucosa, similarly to the manner in which Ener–B is absorbed directly through the nasal mucosa. Tr. at 119 (Olson); 339 (Hathcock); Goodman and Gilman, *The Pharmacological Basis of Therapeutics,* Tr. at 1149–50. Because this route of administration bypasses digestion, the government experts, like the FDA, classified it as parenteral and a non-food. *See, e.g.,* Tr. at 1150–51 (Callaway). Although Dr. Brown opined that there was no scientific basis to distinguish between buccal and intestinal absorption, he did not dispute that they entailed functionally different absorptive mechanisms in the respects identified by the government's witnesses. Tr. at 480.

### DISCUSSION

I. *Statutory Definition of Food, 21 U.S.C. § 321(f) and (g)(1)(C)*

As noted, the core issue before the court is the meaning of the term "food . . . for man" in sections 201(f) and (g)(1)(C) of the Act, 21 U.S.C. §§ 321(f) and (g)(1)(C), and whether Ener–B, a nasally administered vitamin B–12 product, falls within the ambit of that definition. In section 201, the Act defines "food" as follows:

> The term "food" means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for compounds of any such article.

21 U.S.C. § 321(f). Pursuant to section 201(g)(1)(C) of the Act, 21 U.S.C. § 321(g)(1)(C), any article, "other than food," which is intended to affect the structure or function of the "body of man or other animals" is a "drug." In classifying a product marketed to humans under this latter subsection defining drugs, the FDA interprets the "other than food" exception as referring to food for humans, thus avoiding the anomalous result that food used by "nonhuman animal species but labeled for use by humans . . . could not be regulated as a drug even if it were inedible by humans." Ex. 5, p. 29. Nature's Bounty does not contest this interpretation, nor does it deny that Ener–B is "intended to affect the structure or function of the body of man." Thus, the single issue presented is correctly formulated by the government, that is, whether Ener–B is a "food for man" or "food for humans" under these subsections. As noted, the FDA takes the position that the definition of food for man incorporates as necessary elements not only nutritional value but also route of administration via the alimentary canal. Ener–B urges that route of administration is neither expressly incorporated into the statutory definition of food nor could the statute rationally be interpreted to incorporate such an indicium as a necessary element of the definition.

The starting point in interpreting a statute is its language, for "[i]f the intent of Congress is clear, that is the end of the matter; . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Here, neither party appears to contend that the Act's definition of "food" in section 201 is unambiguous on the question whether it is intended to encompass a vitamin nasal gel. The general phrase "food for . . . man" sheds little light on the issue, nor does the general exclusionary lan-

guage "other than food" identify a clear standard by which to reach a resolution. Similarly, although the Supreme Court has written that the Act's "legislative history, read in light of [its] remedial purpose, directs [courts] to read the classification 'drug' broadly," *United States v. Bacto–Unidisk,* 394 U.S. 784, 799, 89 S.Ct. 1410, 1419, 22 L.Ed.2d 726 (1968); *see also United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943), it is clear that Congress has not, through its choice of statutory language or the legislative history of the 1938 Act, directly expressed its intent with respect to the precise question posed here.

It is well-settled that where, as here, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. If the agency's construction "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent," it may not be disturbed. *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991). In assessing an agency's interpretation, the court "need not conclude that the agency construction was the only one it ... could have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843, n. 11, 104 S.Ct. at 2782, n. 11. "Rather, substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it." *Rust,* 500 U.S. at 184, 111 S.Ct. at 1767 (citation omitted). Affording such deference to a reasonable interpretation by the officers or agency charged with a statute's administration is of particular significance where, as here, "specialized agency understanding is involved." *Friends of Shawangunks, Inc. v. Clark,* 754 F.2d 446, 449 (2d Cir.1985). This circuit has recognized that the FDA's determination regarding classification of a substance as a "food" or a "drug" under the Act is generally to be accorded such deference. *See American Health Prod. Inc. v. Hayes,* 574 F.Supp. 1498, 1501 (S.D.N.Y.1983), *aff'd,* 744 F.2d 912, 913 (2d Cir.1984) (affirming "substantial-

ly for the reasons set forth in Judge Sofaer's thorough opinion").

Nonetheless, whether an agency's position will be accorded such controlling significance and, if not, how much weight should be given to its view, will depend on the circumstances of the individual case. *Good Samaritan Hosp. v. Shalala,* —— U.S. ——, ——, 113 S.Ct. 2151, 2161, 124 L.Ed.2d 368 (1993). Thus, for example, "an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation [may be] entitled to considerably less deference than a consistently held agency view." *Id.,* (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987)). On the other hand, inconsistency alone is not enough to defeat a claim of deference, even if the agency's position "represent[s] a sharp break from the Secretary's prior construction of the statute." *Rust,* 500 U.S. at 186, 111 S.Ct. at 1768. As the Supreme Court explained in *Rust:*

> In *Chevron,* we held that a revised interpretation deserves deference because "[a]n initial agency interpretation is not instantly carved in stone" and "the agency, to engage in informed rule making, must consider varying interpretations and the wisdom of its policy on a continuing basis." ... An agency is not required to " 'establish rules of conduct to last forever' " ... but rather "must be given ample latitude to adapt [its] rules and policies to the demands of changing circumstances."

*Id.* at 186, 111 S.Ct. at 1769 (citations omitted). *See also Good Samaritan Hosp.,* —— U.S. at ——, 113 S.Ct. at 2161 ("an agency is not disqualified from changing its mind; and when it does, the courts ... should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes.") (citations omitted); *Himes v. Shalala,* 999 F.2d 684, 690 (2d Cir.1993) ("an inconsistent position alone is not enough to require this Court to give less deference to the Secretary's definition ..."). This is so, at least, as long as the agency's "current interpretation is not at odds with the plain meaning of the statute [and] is reasonable." *Id.* at 690–91; *See also Good Samaritan Hosp.,* —— U.S. at ——, 113

S.Ct. at 2162 (notwithstanding a shift in views, "where the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction"); *Rust*, 500 U.S. at 186–87, 111 S.Ct. at 1768–69 (although agency's position represented a "sharp break with prior interpretation," Secretary's "reasoned analysis" "justified his change of interpretation"); *Compare Lewis v. Grinker*, 965 F.2d 1206, 1223 (2d Cir.1992) (according less deference to Secretary's position because it was the "'rare and exceptional circumstance'" where agency's interpretation "would fly in the face of legislative history"), and *New York City Health and Hosp. Corp. v. Perales*, 954 F.2d 854, 858 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992) (agency's interpretation accorded no deference because it was inconsistent and at odds with the clear intent of the statute).

Similarly, although it is well-established that an agency's "*post hoc* litigation posture ... is entitled to no deference," *Lewis*, 965 F.2d at 1220 (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988)), the authorities invoking this caveat to the rule of agency deference addressed agency positions adopted during the course of the very litigation they were intended to influence. Finally, it is settled that an agency's views may be expressed not only by formal rule making procedures, but also by less formal expressions of agency interpretation. *See, e.g., Himes*, 999 F.2d 684; *Friends of Shawangunks, Inc.*, 754 F.2d 446.

In contending that the FDA's interpretation of "food for ... humans" is entitled to no deference, Nature's Bounty urges that the FDA's current position is inconsistent with its prior position on the issue, and amounts to no more than a *post hoc* litigation strategy. The arguments find no support in the record. The only inconsistency with a prior agency view asserted by Nature's Bounty in its papers is identified as the position taken by the FDA in the so-called "starchblocker" cases, *American Health Products* and *Nutrilab,*

*Inc. v. Schweiker*, 713 F.2d 335 (7th Cir. 1983). The starchblocker cases, however, did not address whether route of administration is a component of the statutory definition of food for humans, but concerned, rather, whether anti-nutrient products could be classified as "foods" under the Act. The position that nutritional value is an essential component of the statutory definition of "food for humans" is not inconsistent with the view that nutritional value is not itself a sufficient definition of that term, which may also entail, as a necessary (albeit insufficient) component, ingestion via the gastrointestinal tract. Nothing in the record of this proceeding suggests that the FDA has ever classified parenterals (such as Ener–B) as foods.

Indeed, the record before the court contains substantial evidence that the FDA has historically and consistently categorized parenterals as non-foods. Thus, on October 8, 1981, the FDA's Vitamin/Mineral Task Force, formed to develop agency policies concerning regulation of "orally ingested vitamin/mineral preparations for use in humans," transmitted its recommendations to the FDA Commissioner. Ex. 5A, p. 1. The report, which recommended that the "agency treat virtually all [orally] ingested vitamin/mineral products for humans as foods," Ex. 5A, p. 2, explicitly excluded parenterals from its scope, stating: "this recommendation does not apply to injectable or topical vitamin/mineral preparations. They would continue to be referred to the Bureau of Drugs." Ex. 5A, p. 3.[4]

Additionally, although the FDA historically regulated vitamin injections as drugs, it granted in 1972 a temporary exemption for certain parenteral multivitamin drug products, permitting them to remain on the market while the FDA implemented a Drug Efficacy Study. 49 Fed.Reg. 36446–49 (1984); Ex. 20E, pp. 22–25. On September 17, 1984, however, the FDA revoked the exemption, thus reverting to its consistent position that parenteral nutrients are regulated as drugs under the Act. The argument by Nature's

---

**4.** Contrary to the contention of Nature's Bounty, nothing in the report detracts from its expression of agency policy on this particular issue. Significantly, too, credible expert testimony at the hearing supported the FDA's view that Ener–B is a topical. Indeed, Nature's Bounty does not contest that Ener–B is properly classified as a parenteral.

Bounty that these parenterally administered products were treated as drugs not because they were considered non-foods but because they were intended to treat diseases is not supported by the Federal Register Notice. For example, one of the preparations that was the subject of the notice is identified as "indicated as [a] daily multivitamin maintenance dosage" and is "also indicated in other situations [involving dysfunction and disease] where administration by the intravenous route is required." 49 Fed.Reg. at 36448. Moreover, as the government observes, the four-page notice reinstating full drug regulation for all parenteral vitamin preparations does not once mention the word "food" or suggest that there exist parenteral vitamins or nutrients that do not fall within the scope of drug regulation.

Perhaps most clearly expressive of FDA policy in this area is the Aminoplex Notice, published in the Federal Register on July 2, 1987. 52 Fed.Reg. 25072–75 (1987); Ex. 20 E, pp. 18–21. This was a response to an April 14, 1986, Citizen's Petition requesting that the FDA classify an injectable amino acid compound for animals as veterinary food. The Citizen's Petition Response concluded that "[a]minoplex is [n]ot a [f]ood," explaining that amino acids, like "vitamins" and other nutrients "intended as injectables have been regarded as drugs by the medical profession, by FDA, and by the regulated industry for more than 40 years." 52 Fed. Reg. at 25072; Ex. E, p. 18. The notice goes on to recite that it has been "long-standing unchallenged policy" of the FDA, "as reported in Trade Correspondence in Vol. 1 Kleinfeld, Dunn and Kaplan, *Judicial Record* 1938–1954," that " '[a]mino acid preparations offered for parenteral use fall in the category of New Drugs.' " *Id.* Further, the response addressed the common sense understanding of the term "food," adopted by Judge Sofaer in *American Health Products*, as the statutory definition intended by Congress in § 201(g)(1)(C) of the Act, writing:

Historically, food is commonly consumed, taken into the body by mouth, not by injection ...

\* \* \* \* \* \*

Judge Sofaer, in the Starch Blocker case, said, "Congress appears to have intended that this component [the parenthetical exclusion of food in section 201(g)(1)(C) of the act] of the statutory definition of 'food' refer to *common usage* ..." [Emphasis added]. *American Health Products v. Hayes,* 574 F.Supp. 1498, 1505 (S.D.N.Y. 1983), food is defined in section 201(f)(1) as "articles used for food or drink ..." The "common usage" standard argues convincingly against considering injectable nutrients as "food" because injection is not a common usage of food.

*Id.* Contrary to the complaint of Nature's Bounty, this notice, published more than a year before the commencement of the instant lawsuits, cannot be discredited as a *post hoc* litigation strategy in this case. Further, it expresses the identical, common sense and scientific rationale that the FDA has invoked in classifying Ener–B as a drug; that is, because, as a parenteral, Ener–B is not a food, it is categorized as a drug notwithstanding its nutritional value.

Finally, the expression of agency policy specifically directed to the issue posed here is the FDA's response to the Citizen's Petition of Nature's Bounty, filed April 2, 1987, which summarized the agency's prior policy governing the relevant interpretation. In its petition, Nature's Bounty asked, among other things, that the FDA classify all vitamins, including its product Ener–B, as foods regardless of route of administration, and do so as an exercise of its administrative jurisdiction. The FDA's May 24, 1988, response, filed as required by administrative regulation, 21 C.F.R. § 10.30, explained (Ex. 5, p. 31):

*Past Agency regulation of products absorbed other than through alimentation*

The Agency has consistently regulated vitamin and mineral parenteral and topically-administered nutritive products as drugs. Intramuscular and intravenous multi-vitamin preparations are also regulated as drugs (see 49 FR 36446; September 17, 1984), as are products marketed for total parenteral nutrition (including products containing fats, proteins, amino acids, and carbohydrates, as well as vitamins and

minerals). The Agency also regulates as drugs large volume parenterals, such as water for injection, saline solutions, glucose solutions and Ringer's lactate, which contain nutritive substances. Because some of these products may predate the passage of the Act in 1938, not all products have been marketed with approved NDAs.

The report of the Agency's Vitamin/Mineral Task Force, established after the passage of the Vitamin and Mineral Amendments of 1976 (which added Section 411 to the Act), concluded that vitamins and minerals taken by mouth would be regulated as foods, while injectable and topical vitamins and minerals would be regulated as drugs. The Agency has followed this policy without exception.

The standard the Agency applies for classification of vitamin, mineral and other dietary products is the route of administration: whether the product (1) is administered through the mouth and esophagus into the alimentary canal for digestion and absorption (and is thus a food); or (2) is administered for direct absorption into the circulatory system by injection or transdermal or transmucosal absorption, bypassing the digestive process (and is thus a drug).

It is clear that past Agency interpretations of the status of parenterally and topically administered vitamin and mineral products are consistent with treating intranasal transmucosally-absorbed vitamin products as drugs.

In sum, there is no evidence in the record disputing the FDA's contention that it has always classified parenteral nutrients, such as injectables and topicals, as drugs. Likewise, no evidence disputes that route of administration has been a criterion consistently invoked by the agency in determining whether the Act requires regulation of a product as a food or a drug. Indeed, in its 1987 Citizen's Petition, even Nature's Bounty acknowledged that the FDA had "consistently viewed ["parenteral foods"] as drugs," although Nature's Bounty concomitantly disclaimed understanding the legal basis for the classification. Ex. 5, pp. 20–21.

Accordingly, unless the FDA's consistently held view of the appropriate interpretation of ambiguous statutory language (unenlightened by legislative history) is unreasonable, it is entitled to substantial deference by this court.

## II. The Reasonableness of the FDA's Interpretation

In this circuit, it is settled that by defining "food" in section 201(f) of the Act as "articles used for food or drink for man," 21 U.S.C. § 321(f)(1), Congress intended that the word have "the everyday meaning of food." *American Health Prod. v. Hayes,* 574 F.Supp. 1498, 1504 (S.D.N.Y.1983), *aff'd,* 744 F.2d 912 (2d Cir.1984). Specifically, discussing the definition of food in subsection 201(f) and the parenthetical exclusion of food in subsection 201(g)(1)(C), Judge Sofaer, in *American Health Products,* reasoned that:

> [b]y repeating the defined term in its own definition, and by making use or function of the definitional criterion, Congress appears to have intended that this component of the statutory definition of "food" refer to common usage. The ordinary way in which an article is used, therefore, not any marketing claim on the part of the manufacturer or distributor as to a specific physiological purpose of that use, should determine whether it is a food for purposes of the parenthetical exclusion of section 321(g)(1)(C).

574 F.Supp. at 1504–05 (citations omitted).

As the government urges and the court acknowledged during the argument of the prior summary judgment motion in this case, common sense usage dictates that food for man is ingested, and that application of nutrients to the membrane of the nasal cavity is not the normal way that humans take in food. The FDA's interpretation of the statutory term thus comports with the everyday meaning of the word "food." Indeed, every expert who testified at the hearing, both government and defense, agreed with the court and the agency that the ordinary, common sense understanding of the term "food" entails ingestion into and absorption in the gastrointestinal tract, thus excluding from the common sense definition of food a nasally admin-

istered product like Ener–B. *See* above at 6–7.

The expert testimony on the definitional issue was not similarly unanimous because the defense experts generally espoused a broader and more generic definition of food, which did not entail route of administration. The evidence at the hearing, however amply established that well-qualified and credible doctors and scientists are of the opinion that the medical and scientific definition of the term "food for ... humans" is consistent with both the common sense understanding of the term and the FDA's interpretation of it. *See* above at 7–9. Indeed, even defense experts who personally disagreed with this scientific definition acknowledged that the issue was one as to which reasonable scientists could reasonably disagree. *See* above at 12–13. Moreover, the uncontradicted expert evidence concerning the marked distinctions in function and physiology between the nasal cavity and the gastrointestinal tract also supports the interpretation of "food" adopted by the FDA. *See* above at 10–12. At the very least, it cannot be said that the FDA's interpretation of the statutory definition is unreasonable, either as a matter of common sense or as a matter of expert opinion.

Finally, the argument by Nature's Bounty that the FDA's classification of nasogastric feeding as food is inconsistent with its classifying Ener–B as a drug on the basis of its route of administration was shown at the hearing to be flawed. As noted, nasogastric or tubal feeding of ill persons unable to ingest food in the ordinary way is in fact, physiologically, enteral feeding. *See* above at 13–14. The tube, although anchored in the nose, does not permit any contact between its contents and the nasal mucosa. Rather, it simply acts as an artificial esophagus delivering nutrients directly to the stomach and intestines. This method of administering nutrients is distinct from the administration of Ener–B, which is absorbed directly into the blood stream through the nasal mucosa, thus bypassing the barrier and exchange mechanisms present in the gastrointestinal tract.

In sum, both the expert testimony adduced at the hearing and common sense usage support as reasonable the agency's view that parenterals, like Ener–B, are not "food" within the meaning of §§ 201(f) and (g)(1)(C) of the Act. The agency's construction conflicts with neither the language of the Act nor its legislative history. Accordingly, the FDA's determination that under the Act, Ener–B, as a parenteral, should be regulated as a drug is entitled to deference absent a cogent reason for limiting or eliminating that deference. As related below, the remaining arguments of Nature's Bounty do not provide such a reason.

### III. The Proxmire Amendments

In 1976, Congress enacted the Proxmire Amendments, 21 U.S.C. § 350, aimed at preventing the FDA from regulating vitamin and mineral supplements as drugs solely on the basis of their potency. The amendments state in part:

(a) Authority and limitations of Secretary; applicability

(1) Except as provided in paragraph (2)—

(A) the Secretary may not establish, under section 321(n), 341, or 343 of this title, maximum limits on the potency of any synthetic or natural vitamin or mineral within a food to which this section applies;

(B) the Secretary may not classify any natural or synthetic vitamin or mineral (or combination thereof) as a drug solely because it exceeds the level of potency which the Secretary determines is nutritionally rational or useful;

\* \* \* \* \* \*

(c) Definitions

(1) For purposes of this section, the term "food to which this section applies" means a food for humans which is a food for special dietary use—

(A) which is or contains any natural or synthetic vitamin or mineral and

(B) which—

(i) is intended for ingestion in tablet, capsule, or liquid form, or

(ii) if not intended for ingestion in such a form, does not simulate and is

not represented as conventional food and is not represented for use as a sole item of a meal or of the diet. 21 U.S.C. § 350.

Nature's Bounty argues that Ener–B is a "food for special dietary use" under this section and is therefore entitled to "food" status under the Act, regardless of its nasal route of administration. This is because, it claims, under subsection (c)(1)(B)(ii), Ener–B is "not intended for ingestion" and "does not simulate . . . conventional food and is not represented for use as a sole item . . . of the diet." This argument does violence to the language of the statute and cannot be reconciled with its legislative history.

At the outset, the argument ignores that, by its language, the section applies only to "*food for humans* which is a food for special dietary use . . ." 21 U.S.C. § 350(c)(1) (emphasis added). The section is thus expressly limited to products meeting the definition of food set forth in the definitional sections of the original Act, that is, 21 U.S.C. §§ 321(f) and (g)(1)(C). Because, as noted, Ener–B is not "food for humans" within the meaning of those sections, it cannot qualify for any protection as "food" under § 350. The Proxmire Amendments are therefore of no avail at all to Ener–B.

Moreover, the argument that § 350(c)(1)(B)(ii) accords food status to dietary supplements that are not ingested into the gastrointestinal tract does similar violence to the language of that subsection. The plain meaning of the language of the subsection is that it applies to "food for humans . . . for special dietary use" containing a vitamin or mineral which is (i) "intended for ingestion in a tablet, capsule, or liquid form" or (ii) "intended for ingestion" in some other form that does not simulate conventional food and is not represented as the sole item of the diet. The subsection, by its clear language, does not apply to dietary supplements that are not "intended for ingestion," that is, that are not intended to be taken into the gastrointestinal tract. Because Ener–B is not intended for ingestion, it does not fall within the language of the subsection. Indeed, contrary to its position in papers submitted following the hearing, Nature's Boun-

ty acknowledged in its Citizen's Petition that this is the plain meaning of the language of the subsection, writing that "the statute . . . contemplates that special dietary foods . . . may be intended for ingestion in forms other than tablets, capsules or liquids." Ex. 5, pp. 12–13. While Nature's Bounty now disavows its prior interpretation, choosing instead simply to read the phrase "in such a form" out of the statute, 21 U.S.C. § 350(c)(1)(B)(ii), its strained efforts to find support for classifying its parenteral product as a "food" run directly contrary to the language of the subsection it seeks to invoke.

Other language in § 350 supports the conclusion that the Proxmire Amendments do not require the FDA to accord food status to all vitamin and mineral supplements. Indeed, the provision that "the Secretary may not classify any . . . vitamin or mineral . . . as a drug *solely* because it exceeds [a certain] level of potency . . ." 21 U.S.C. § 350(a)(1)(B) (emphasis added), unambiguously implies that the Secretary *may* classify a vitamin or mineral as a drug for reasons other than potency, even though it is not being used to treat a disease.

Finally, the legislative history of § 350 demonstrates that Congress intended the amendments to limit the Secretary's authority only with respect to orally ingested vitamins and minerals. The Conference Committee, which drafted the final version of the 1976 statute, related in its report that it had adopted the Senate version of the bill with only two technical amendments. S.Rep. No. 743, 94th Cong., 2d Sess. 25 (1976). The final Senate Report, which is the clearest indicator of Congressional intent, stated:

> This section prohibits the FDA from regulating the composition of *oral* preparations of vitamins and minerals, and combinations thereof, unless they are toxic, habit forming, or must be administered by the direction of a physician or where they are marketed for drug use.

S.Rep. No. 509, 94th Cong., 1st Sess. (1975) (emphasis added). Thus, legislative history supports the plain meaning of the language of the Proxmire Amendments—that they were not intended to apply to a parenteral product like Ener–B at all.

## IV. Sublinguals and Alleged Discriminatory Enforcement

The final argument offered by Nature's Bounty is that the FDA has acted in an arbitrary, capricious, and discriminatory manner by failing to regulate sublinguals as drugs. Nature's Bounty relies on authority holding that "[p]atently inconsistent application of agency standards to similar situations lacks rationality and is arbitrary." *Contractors Transp. Corp. v. United States,* 537 F.2d 1160, 1162 (4th Cir.1976). *See also United States v. Diapulse Corp.,* 748 F.2d 56, 62 (2d Cir.1984); *Marco Sales Co. v. Federal Trade Commission,* 453 F.2d 1, 7 (2d Cir.1971).

Nature's Bounty is correct that actual inconsistency in agency treatment of similarly situated parties is prohibited as arbitrary and discriminatory. Short of such actual inconsistency, however, administrative agencies have broad discretion in enforcement decisions and may decide how and when such actions will be brought. Thus, an agency's failure to bring an enforcement action against another party is not itself a defense in an enforcement action because the agency is in the best position to assess whether its resources should be expended on one violation or another. The Supreme Court has expanded upon why the enforcement decision is generally committed to agency discretion, noting the many considerations governing the determination:

> First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to take on the action at all.

*Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985).

Thus, the FDA's decision not to take enforcement action, at least where the agency has not adopted a positive regulatory approach that is inconsistent with respect to similarly situated parties, is presumed immune from judicial review under the Administrative Procedure Act, 5 U.S.C. § 501 *et seq. Id.* at 837–38, 105 S.Ct. at 1658–59; *see also Schering Corp. v. Heckler,* 779 F.2d 683, 685–86 (D.C.Cir.1985); *National Milk Producers Fed. v. Harris,* 653 F.2d 339, 343 (8th Cir.1981).

There is no evidence in the record suggesting that the FDA has affirmatively adopted such an inconsistent approach to the regulation of sublinguals and Ener–B. Indeed, while it is true that no enforcement action has as yet been taken against sublinguals, the FDA has never taken the position that sublingual tablets are foods. In fact, the agency has asserted in response to the Citizen's Petition by Nature's Bounty that sublingual tablets are not foods and are therefore unapproved new drugs. Ex. 5, p. 32. Hence, the FDA's failure at present to take enforcement action against sublinguals provides no defense to Nature's Bounty in these lawsuits. *See B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1205 (2d Cir.1992).

## CONCLUSION

For the foregoing reasons, it is recommended that the court defer to the FDA's determination that Ener–B is an unapproved new drug pursuant to 21 U.S.C. § 321(p), subject to condemnation under 21 U.S.C. § 334; and that the court permanently enjoin Nature's Bounty from selling Ener–B, pursuant to 21 U.S.C. § 332.

Any objections to this report and recommendation must be filed with the Clerk of Court within 10 days of receipt of this report. Failure to file objections within specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. §§ 6(a), 6(e), 72; *Small v. Secretary of Health and Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989).